JOSEPH T. W. ENGLAND, appellant, v. WALTER W. ENGLAND et al., appellees.

No. 47982.

(Reported in 51 N.W.2d 437)

FEBRUARY 5, 1952.

James A. Lucas and Ralph C. Jones, both of Bedford, for appellant.

Frank F. Wilson, of Mount Ayr, and Thomas E. Mullin, of Creston, for appellees.

GARFIELD, J.—For convenience we refer to Walter W. England as if he were sole defendant. Other defendants are his wife and three mortgage holders.

In July 1931 plaintiff, Joseph England, then sixty-eight, owned 520 acres of heavily mortgaged farm land. Like many large owners of mortgaged land about that time he was in financial difficulties. On July 30, 1931, he deeded to his son Sam 120 acres mortgaged for $15,000. In 1932 Sam deeded this land to the mortgagee for $600. This 120 acres is not involved here.

Also on July 30, 1931, plaintiff deeded to his son Walter, then twenty-nine, 360 acres for an express consideration of $5000 for labor. The 360 acres was mortgaged for about $24,000. In 1933, 160 of the 360 acres was deeded to the holder of the mortgage thereon in satisfaction of it. This 160 acres is also not here involved. But the remaining 200 acres deeded to defendant is part of the land in controversy. The rest of the 520 acres owned by plaintiff before July 30, 1931, was his homestead forty acres which he continued to own. Plaintiff seeks to recover rent for this "forty" in this action. The trial court allowed him $1000 rent, which plaintiff asserts is not enough.

One hundred twenty of the 200 acres defendant retained was in 1931 subject to a mortgage for $4000, and 80 of it, together with the homestead forty, were mortgaged to a federal land bank for something less than $8000. Defendant paid the $4000 mortgage in 1937 and had reduced the land bank mortgage to about $4200 at the time of trial in August 1950.

When plaintiff deeded the 360 acres to defendant in 1931 he also transferred to him about 150 to 200 hogs, 14 cows and some calves, 50 sheep, 10 horses and some farm machinery.

Since 1931 defendant has acquired from third parties 560 acres additional land with a mortgage on 320 acres of it for $25,000. Plaintiff had nothing to do with these purchases.

Plaintiff's petition, filed December 27, 1949, alleges he and defendant each own an undivided half of the entire 760 acres held in defendant's name, 300 cattle, 300 hogs and certain farm machinery, asks sale thereof, division of the proceeds and an accounting. An amendment to petition filed five months later asserts the making of the deed and transfer to defendant of 400 head of livestock and farm machinery in 1931 and states it was then verbally agreed defendant would hold the land and livestock in his name for the benefit of both plaintiff and defendant and

they would become equal partners in operating the land. Rent of the homestead forty is also claimed.

Another amendment to petition, filed the day before trial commenced, alleges defendant intended not to perform the above verbal agreement when made but to defraud plaintiff by not accounting for the proceeds of the land and livestock. It prays a trust be established in plaintiff's favor against the land and personalty for his share thereof.

Defendant's answer admits the deed and transfer to him of some livestock and machinery, denies there was any verbal agreement or fraud, alleges payment of rent of the homestead forty and that the action is barred by laches.

After trial the court held neither a partnership nor fraud was proven and the only relief due plaintiff was $1000 rent of the homestead forty. All costs were taxed to defendant. Plaintiff has appealed. We affirm the trial court.

I. It clearly appears plaintiff deeded the 360 acres to defendant and the 120 acres to Sam in an attempt to prevent his creditors from resorting thereto. Plaintiff frankly testifies, on direct examination, the reason he made the deed to defendant was the "loan companies had quite a hold on me. They were going to foreclose on some of it and I wanted to save something. In them days they took it all." On cross-examination, he says, "The reason that was deeded was to avoid foreclosure and deficiency judgments and to salvage what little I could by all that was legal." There is much similar testimony.

As a rule, subject to certain exceptions, equity will not aid such a transferor but will leave the parties where it finds them. The maxim "he who comes into equity must come with clean hands" governs. Shaw v. Addison, 239 Iowa 377, 397, 398, 28 N.W.2d 816, 826, 827, and citations; Willis v. Robertson, 121 Iowa 380, 384, 385, 96 N.W. 900. See also Restatement, Trusts, section 63, and comment b.

However, since defendant does not argue this proposition we base our decision upon other grounds which are urged.

II. Plaintiff relies upon the rule that where one obtains title to property by fraud, abuse of confidence, unconscionable conduct or questionable means, so he cannot equitably retain the

property, which really belongs to another, equity will construct a trust upon it in favor of the one in good conscience entitled to it. See Rance v. Gaddis, 226 Iowa 531, 541, 542, 284 N.W. 468, and citations; annotation 159 A. L. R. 997, and earlier annotations therein cited; Restatement, Trusts, section 44, and comment b; 54 Am. Jur., Trusts, section 218; 65 C. J., Trusts, section 215.

We assume, as defendant apparently does, without so holding, the rule relied upon has application here notwithstanding plaintiff's purpose in transferring the land and personalty to defendant was that stated in Division I hereof.

█ In any event, plaintiff is entitled to no relief in his main case against defendant, holder of the legal title, unless the oral agreement asserted by plaintiff is proven by clear, satisfactory and convincing evidence. Thompson v. Thompson, 240 Iowa 1162, 1172, 1173, 39 N.W.2d 132, 138, 139, and citations; Copeland v. Voge, 237 Iowa 102, 107, 20 N.W.2d 2, 5; Rance v. Gaddis, supra, 226 Iowa 531, 544, 284 N.W. 468; Willis v. Robertson, supra, 121 Iowa 380, 383, 96 N.W. 900. See also Shaw v. Addison, supra, 239 Iowa 377, 384, 28 N.W.2d 816, 820.

█ Of course we are justified in giving weight to the findings of the trial court, especially since the credibility of witnesses and defendant's good faith are largely involved. Hilliard v. Hilliard, 240 Iowa 1394, 1398, 39 N.W.2d 624, 626; Thompson v. Thompson, supra, 240 Iowa 1162, 1171, 39 N.W.2d 132, 137, and citations; Hatheway v. Hanson, 230 Iowa 386, 396, 297 N.W. 824, 828.

We are agreed plaintiff has not established his main case by the requisite proof. Testimony for him consists largely of conclusions and opinions of interested witnesses, defendant's brothers or sisters or their spouses, who would probably benefit from a decree for plaintiff, eighty-six at time of trial. Much of the evidence is hearsay or conclusions therefrom. The disinterested witnesses do not aid plaintiff. Of the five persons with personal knowledge as to the claimed oral agreement, two, plaintiff's wife and Attorney Smith, who prepared the 1931 deeds, are dead. Survivors are plaintiff, the son Sam and defendant.

This is a sample of plaintiff's testimony on direct examination:

"Before the deed was made we had an agreement with Walter we were to go along 50-50 on the land after I deeded it to him. Q. Was anything said about how he was to hold the title? A. I don't just remember. Q. Was the agreement, to refresh your recollection, that he was to hold it for the benefit of both of you? (Objected to as leading.) A. Oh yes, I think he was to hold the property. Q. For the benefit of both of you? A. Yes. Q. And what about the livestock and machinery? A. I just turned that over to him. Q. Under the same kind of an agreement? (Objected to as leading.) A. Yes."

On cross-examination plaintiff says, in part: "I don't remember what we said, we just entered into an agreement here when the deeds were made. * * * Walter was going to work on it and keep it if something happened to me. I did it so we would have something to work on. I don't like to be out of work."

A sample of Sam's direct examination is:

"They agreed they would go on a 50-50. Q. Was anything said about what was to become of the land? A. They were to go ahead on a 50-50 deal. Q. Was anything said about the title? A. I don't know as there was. * * * Q. Was Walter supposed to hold this land for the benefit of both him and your father? (Objected to as leading.) A. That is the way I take it."

On cross-examination Sam was unable to relate anything his father said when the 1931 deeds were made.

A son-in-law of plaintiff testifies that probably in 1934 when defendant was plowing corn the witness inquired how he was getting along and defendant said, "We are partners and it don't look like we are going to get much out of it." A son says that in 1947 defendant told him it was a 50-50 partnership and his father owned half the land and personal "stuff." Other testimony for plaintiff consists largely of conclusions of another son, two daughters and their husbands there was a partnership. This is mainly based on indefinite talk among some of the family not in defendant's presence.

Defendant denies anything was ever said between him and plaintiff about a partnership. Several disinterested witnesses who worked on part of the land in controversy or lived near it

deny any knowledge of the claimed partnership and relate statements and conduct of plaintiff or other circumstances inconsistent with it. An insurance man and a bank president with whom defendant did considerable business, witnesses for plaintiff, also deny knowledge of any partnership.

The weight of the evidence is that plaintiff relinquished to defendant management and control of the property transferred to him in 1931 and plaintiff made no claim there was a partnership agreement until about 1946 when his wife died and he went to live with Sam. Prior to that plaintiff and his wife had continued to reside on the homestead forty until 1944 when they moved to a small town in a home defendant provided for them. Defendant paid the taxes, interest, insurance and other expense upon the land.

There is evidence defendant had worked · for plaintiff at least 12 years before 1931 under a promise he would get something for it and the deed was made in part to fulfill that promise. While plaintiff testifies he did not think he then owed defendant as much as $5000 (the consideration the deed recites), he admits he never figured the amount. There is also testimony plaintiff had assisted his other three sons in amounts totaling $17,000. There is no evidence defendant induced plaintiff to make the deed to him, except perhaps by the farm work he had done, nor of reliance by plaintiff upon any such inducement.

If it be assumed the claimed oral agreement for a partnership were established, the only evidence of fraud is defendant's subsequent refusal to perform the agreement. This alone is not conclusive or sufficient. There must be other evidence of an intent, at the time of the agreement, not to perform it. Stout v. Stout, 165 Iowa 552, 558, 146 N.W. 474, L. R. A. 1915A 711; Willis v. Robertson, supra, 121 Iowa 380, 385, 386, 96 N.W. 900; Gregory v. Bowlsby, 115 Iowa 327, 331, 88 N.W. 822; All v. Brillaman, 200 S. C. 279, 20 S.E.2d 741, 159 A. L. R. 981, 993, and annotation 997, 1005; annotations 35 A. L. R. 280, 288, 80 A. L. R. 195, 199; Restatement, Trusts, section 44, comment b, page 136.

It is doubtful if the value of the land plaintiff conveyed to defendant then exceeded the mortgage debt against it. Plaintiff, himself, testifies there was not a great deal of equity in it and

farm land was not then salable. Although the livestock and machinery were not incumbered their value was then very much less than present values of such property.

There is other testimony unfavorable to plaintiff's main case, such as the fact no partnership income-tax returns were filed, but we deem further discussion of the evidence unnecessary. It is clearly insufficient to entitle plaintiff to a half interest in the 560 acres defendant subsequently purchased, nor does it warrant any relief in the main case.

█ Plaintiff strongly relies on defendant's refusal on cross-examination to say he did not owe plaintiff anything. So far as shown, defendant may have had in mind he owed plaintiff for rent of the homestead forty or exhibited a ·willingness to abide by the court's decision of the main case. This testimony is not controlling.

Decisions which support our holding in this division include McMains v. Tullis, 213 Iowa 1360, 241 N.W. 472; Wagner v. Wagner, 208 Iowa 1004, 1009, 224 N.W. 583, 585 ("The testimony of declarations and admissions * * * is not of a high order. * * * Its accuracy cannot be depended upon."); Kelley v. Kelley, 189 Iowa 311, 177 N.W. 45, where it was claimed there was a partnership between mother and son in farming operations; Butler v. Butler, 151 Iowa 583, 585, 132 N.W. 63, 64 ("The effect of an unconditional conveyance cannot be neutralized or destroyed by vague * * * understandings of the parties."); Willis v. Robertson, supra, 121 Iowa 380, 96 N.W. 900.

The facts of this case are not comparable to those in Rance v. Gaddis, supra, 226 Iowa 531, 284 N.W. 468, Carlson v. Smith, 213 Iowa 231, 236 N.W. 387, 80 A. L. R. 186, and other precedents relied upon by plaintiff.

█ III. We also think plaintiff's case, except that for rent of the homestead, is barred by laches.

Delay in asserting a claim does not ordinarily amount to laches unless the adverse party is prejudiced thereby. The doctrine is applied where recovery would be inequitable or clearly unjust. It is an application of the maxim, "Equity aids the vigilant, not those who slumber on their rights." An equity court enforces the rule of laches according to its ideas of right and justice. Each case is governed chiefly by its own circum-

stances. Sinclair v. Allender, 238 Iowa 212, 228, 229, 26 N.W.2d 320, 329, and citations; Schmidt v. Schurke, 238 Iowa 121, 126, 25 N.W.2d 876, 879, and citations; Mahaffy v. Faris, 144 Iowa 220, 227, 122 N.W. 934, 24 L. R. A., N. S., 840; Deitz v. Deitz, 298 Mich. 253, 298 N.W. 522.

Nearly eighteen and one-half years elapsed between the 1931 transaction and commencement of this suit. There is no testimony plaintiff asked defendant for a settlement until shortly before he moved to town in 1944. The weight of the evidence is, as stated, no such request was made until after his wife died in 1946. Plaintiff himself testifies he never asked defendant to deed the land back to him, "never asked Walter for anything on anything", never talked about the partnership matter from 1931 until 1949. Sam, who actively encouraged this suit, says on direct examination "after mother's death in 1946 plaintiff started to ask Walter for a settlement." Defendant testifies plaintiff never asked him for an accounting and he first heard a partnership was claimed after this suit was started. No adequate excuse for such unreasonable delay appears.

During the eighteen and one-half years circumstances changed materially. The property was saved from creditors and its value greatly increased, partly from economic conditions, partly from defendant's efforts. Existing incumbrances were paid in whole or in part. The property plaintiff transferred to defendant is only a small part of what defendant now owns in which plaintiff claims a half interest. Plaintiff has delayed asserting his claim until it seemed profitable to do so.

Plaintiff's wife (defendant's mother) and Attorney Smith who had personal knowledge as to the claimed partnership agreement are dead and their testimony is of course not available to defendant. Notwithstanding section 622.10, Code, 1950, prohibiting testimony as to confidential communications, Mr. Smith's testimony would have been admissible since, as Sam testifies, he acted as adviser to both plaintiff and defendant who went together to his office, if indeed he was more than primarily a scrivener of the deeds. Luthy v. Seaburn, 242 Iowa 184, 188, 46 N.W.2d 44, 46, and citations; Crawford v. Raible, 206 Iowa 732, 739, 740, 221 N.W. 474, 478, and citations; annotation 141 A. L. R. 553, 554; 58 Am. Jur., Witnesses, section 496. Olsen

v. Olsen, 236 Iowa 313, 318, 319, 18 N.W.2d 602, 605, holds a scrivener is not within the rule excluding confidential communications between attorney and client. Much weight might well have been given Mr. Smith's testimony.

This from Mahaffy v. Faris, supra, 144 Iowa 220, 227, 122 N.W. 934, 936, 24 L. R. A., N. S., 840, applies here: " 'The interest conveyed was of small value at the time. It has become of considerable value since, partly through * * * good management of defendant. Complainants made no claim to it until the advance was realized * * * waiting to charge a fraud when they could do so with certain profit; but in contemplation of equity they waited altogether too long. Their laches * * * stands wholly unexcused.' "

And this from Gilmore on Partnerships has some application:

"The doctrine of laches is of great importance where persons have agreed to become partners, and one of them has unfairly left the other to do all the work, and then, there being a profit, comes forward, and claims a share of it. In such cases as these, the plaintiff's conduct lays him open to the remark that nothing would have been heard of him had the joint adventure ended in loss instead of gain; and a court will not aid those who can be shown to have remained quiet in the hope of being able to evade responsibility in case of loss, but of being able to claim a share of gain in case of ultimate success." (Page 496.)

Other authorities previously cited in this division support our conclusion on the matter of laches. See also Copeland v. Voge, 237 Iowa 102, 110, 111, 20 N.W.2d 2, 6.

IV. As stated, the trial court allowed plaintiff $1000 rent of the homestead forty from 1931 to 1949. Plaintiff contends he is entitled to $6000 to $8000. We are not inclined to increase the allowance.

Except for two and one-half acres the forty is rough land, timber pasture and building lots. Plaintiff and his wife lived there until 1944. Defendant lived with them until 1940. Testimony as to reasonable rental for pasture land varies from Sam's estimate of $10 an acre per year to that of a disinterested, well-qualified witness of $2.50 per acre. The trial court was in better

position than we to fix the reasonable rental value. It would seem the last figure is nearer right than the first, at least for much of the period in question.

Defendant, who pleaded payment, is entitled to numerous credits. It is true the exact amounts of most of these credits are not shown, nor can they be. Defendant's failure to keep a record of these credits may be excused by the fact he was never asked to pay rent on the forty. It would be unusual under the circumstances if such a record were kept.

Defendant paid taxes on the forty estimated at $40 a·year, interest and instalments on the principal of the mortgage against the forty and eighty of the 200 acres deeded him, insurance premiums and expense of keeping up the buildings. (As stated, the amount of the mortgage at time of trial was about $4200.) Defendant provided plaintiff and his wife the home in which they lived in town from 1944 to 1946. Throughout the entire period for which rent is claimed defendant permitted plaintiff to write checks on defendant's bank account. Plaintiff says he wrote one or two such checks a month for $10 or $12. Defendant paid his mother's funeral expenses of $469 and plaintiff's hospital bill of undisclosed amount.

On the whole we are not persuaded that $1000 does not fairly approximate the balance due on plaintiff's claim for rent. —Affirmed.

All JUSTICES concur except SMITH, J., not sitting.