EARL H. BELL et al., appellants, v. DELMAN T. PIERSCHBACHER et ux., and DELMAN T. PIERSCHBACHER, executor of estate of M. D. BELL, appellees.

No. 48403.

(Reported in 62 N.W.2d 784)

Stuart & Stuart, of Chariton, for appellants.

Garrett & Bown, of Corydon, for appellees.

GARFIELD, J.—This is an action in equity for specific performance of an alleged oral contract of decedent, M. D. Bell, under which plaintiff Earl H. Bell, an adopted son, claims to own the personal property left by decedent and a life estate in a farm of about 120 acres, and plaintiff Lloyd C. Bell, Earl's son, claims the remainder interest in the farm. Defendants Delman T. and LaVon Pierschbacher, husband and wife, are grantees of a deed to the farm from decedent and legatees of substantially all his personalty. For convenience we disregard the fact that Delman as executor of the will of M. D. Bell is also a defendant.

After trial the district court held proof of the claimed oral contract was not clear, satisfactory and convincing, dismissed plaintiffs' petition, and quieted title to the farm in defendants.

While our review is de novo (rule 334, Rules of Civil Procedure), we give weight to the trial court's findings. The case involves quite largely fact questions which the trial court was in better position than we to decide. Owen v. Wilden Hospital, Inc., 245 Iowa 382, 62 N.W.2d 186; Salem v. Salem, 245 Iowa 62, 70, 60 N.W.2d 772, 776; England v. England, 243 Iowa 274, 278, 51 N.W.2d 437, 440.

As plaintiffs concede, proof of the claimed oral contract must be clear, satisfactory and convincing. A mere preponderance of the evidence is not sufficient. Vanston v. Rupe, 244 Iowa 609, 618, 57 N.W.2d 546, 551; England v. England, supra, 243 Iowa 274, 278, 51 N.W.2d 437, 439; Byers v. Byers,

242 Iowa 391, 409, 46 N.W.2d 800, 809; Williams v. Harrison, 228 Iowa 715, 723, 293 N.W. 41.

We are not persuaded plaintiffs have established their case by the requisite degree of proof.

Decedent, M. D. Bell, owned and occupied the farm in controversy until he died March 17, 1952. His wife Louella also lived there until she died in January 1945. Plaintiff Earl H. Bell, fifty at time of trial, and his brother Wheeler were adopted by M. D. Bell and wife and went to the Bell farm to live in 1911 when Earl was nine. They were sons of Richard Halleck, a cousin of Louella Bell. The Bells had no children of their own.

Earl helped with the farm work until he moved to another farm when he was about twenty-four, a year or so after he was married in 1925. In 1932 his wife and daughter died and Earl, with his son Lloyd, twenty-five at time of trial, returned to the Bell farm. In 1943 Earl began working for the Beatrice Creamery in Chariton but continued to live in the Bell home. Mrs. Bell was bedfast from the spring of 1944 or perhaps earlier until she died. Earl cared for her at night. Mr. Bell and a housekeeper cared for her during the day.

In November 1944, Mr. Bell wrote Lloyd Halleck, a blood brother of Earl Bell, that Mrs. Bell was "awful sick" and if he wanted to see her he ought to come down from Waterloo to do so. Halleck then came to the Bell farm from Waterloo. He testifies Mr. and Mrs. Bell both said they wished Earl was home. "I said if you'd give Earl a good deal you might give him something to work for." Halleck offered to drive Mr. Bell to Chariton to talk to Earl. Halleck says he and Mr. Bell then went to Chariton and "We talked the subject over and Melville [M. D. Bell] gave Earl the proposition to stay on the farm as long as Mother was alive and he had a 50-50 proposition with the understanding he'd use the farm until he died and then it'd take to Earl and then Lloyd."

"Q. [By plaintiffs' counsel] Was that the substance of what Melville said to Earl? A. Yes sir.

"Q. What if anything did Earl say? A. Well I guess they come to an agreement.

"Q. What did Earl say whether or not he would accept it? A. They must have made an agreement because he went back there.

"Mr. Garrett [defendants' counsel]: I move to strike the last two answers as an opinion or guess.

"Mr. Stuart: I admit that may go out. Was it talked? A. It was talked over, yes.

"Q. And Melville submitted the proposition you have related? A. Yes.

"Q. What did Earl say when his father made him that proposition? A. He said he'd go back out there."

Evidently plaintiffs were not entirely satisfied with the above testimony because at the close of defendants' evidence we find this record:

"Mr. Stuart: Plaintiffs desire to recall Lloyd Halleck and he has returned to Waterloo, and plaintiffs request until tomorrow morning to produce this witness, and claim if he were present he would testify in reference to the conversation between him, Earl Bell and M. D. Bell about which he has given some testimony, that at the time M. D. Bell proposed to Earl Bell that if he would come back to the farm and stay and help take care of Mrs. Bell so long as she lived and do the farming, that he would fix his business so that when he died, the property would go to Earl and then to Earl's boy.

"Mr. Garrett: Defendants, while denying the truth of any such testimony, admit, in order that it may not be necessary to recall the witness, he would so testify if he were present."

We have set out the testimony of Lloyd Halleck fully because it is the only direct evidence of the oral agreement alleged by plaintiffs. The rest of plaintiffs' case consists largely of claimed declarations of M. D. Bell made after Earl gave up his job in Chariton and returned to the farm about December 1, 1944. While plaintiffs contend Earl fully performed his part of the agreement between December 1 and Mrs. Bell's death the following month (the exact date of her death is not shown) Earl stayed on the farm until February 1947, when he left permanently. Earl says his mother's condition was "very

serious" when he returned to the farm. In the meantime Earl's son Lloyd was inducted into military service the last of September 1946 until January 12, 1948. Lloyd did not live on the farm after September 1946.

In July 1945, Earl married a second time. His second wife had been married before and had two children. They all made their home with M. D. Bell until February 1947. Evidently M. D. Bell did not like the way Earl did the farm work nor did he entirely approve of the conduct of Earl and his second wife and did not always get along well with them. He was disappointed that Lloyd would not return to the farm when he was discharged from the service.

We refer now to evidence of claimed declarations made by M. D. Bell. Mrs. Decker, the Bells' housekeeper from January 1944 until July 1945, when Earl was married again, says that one time after Mrs. Bell died she asked M. D. Bell "where the place go to when he was gone; well, he said that goes to the Bells, it'll stay in the Bells' name all the time. He mean Earl and Lloyd. He said it more than once." Mrs. Decker also testifies Mrs. Bell said "everything here belongs to Earl. That's what she said and that was true. I will not tell any lies."

Guilford McCoy says that during the fall of 1947 M. D. Bell told him, "I had an original agreement with Earl to leave everything to him during his lifetime and then it was to go to his son Lloyd but he says Earl got to drinking and married a woman I didn't approve of so I changed it and signed it all over to Lloyd."

Frank Boothe testifies that on February 21, 1947, he asked M. D. Bell why he didn't sell the farm and move to town. "He said he would not move to town or sell the farm. He said Earl got the use of that farm and when Earl was through with it, it went to the boy."

John Neighbours, employed by the Beatrice Creamery in Chariton in 1944, says that M. D. Bell came there to talk to Earl during the fall and told the witness his wife was bedfast and he had to have someone take care of her; Earl quit the creamery in December.

Troy Irving testifies that on February 26, 1947, M. D. Bell

told him, "I've given the farm to Earl and it's to go to Lloyd when I'm through with it. When Lloyd gets back from the service I expect Lloyd to take the farm and everything here and run it."

Mrs. Larrington says that down to 1946 "Any number of times he [M. D. Bell] said what he had would.go to Lloyd Bell when he was done with it."

Arthur Hixson testifies that M. D. Bell called him down to fix a light plant about the time Lloyd went into the service. "I was making fun of his light plant and said 'Why don't you junk the old thing?' He says 'Well, I don't know. I may not be here very much longer. Why would I want to monkey with it? When I'm done with it it goes to Earl and Lloyd.'

"Q. Has Mr. Bell at other times made a similar statement as to where his property was to go? Yes at different times."

There is evidence that M. D. Bell made a will on October 3, 1945, in which he disposed of " 'any and all property I may own at the time of my death' " by leaving all personal property to Earl " 'except the good dishes in china closet which I give to my grandson Lloyd C. Bell' ", and a life estate in his farm to Earl with remainder to Lloyd. Wheeler Bell, Earl's brother, was left $10. M. D. Bell made three subsequent wills to which we later refer. Two. witnesses for plaintiffs say they regarded M. D. Bell very highly. One of them adds he was an honest man of his word.

There is no testimony except that given by Lloyd Halleck that his brother Earl Bell returned to the farm under an agreement to stay *only until the death of Mrs. Bell* which occurred, as could be expected, less than two months later. Defendants argue it is not probable M. D. Bell would make no provision for his own care after the death of his wife which appeared to be imminent. The argument seems to have merit. Obviously plaintiffs are not entitled to prevail if the agreement was that Earl should stay on the farm during M. D. Bell's life because Earl left there five years before M. D. Bell died.

We may also observe there is no testimony even from Lloyd Halleck that M. D. Bell expressly agreed not to dispose of his personal property or his farm during his lifetime. In-

deed the evidence actually given by Halleck makes no reference to personalty. "Even where a surviving spouse is obligated to dispose of his property at death in a certain manner courts are slow to hold he cannot dispose of his own property in good faith during his lifetime unless he has expressly agreed not to' do so." Schultz v. Brewer, 244 Iowa 21, 26, 55 N.W.2d 561, 563. See also Kisor v. Litzenberg, 203 Iowa 1183, 1193, 212 N.W. 343. There is no claim M. D. Bell acted in bad faith in deeding the farm, and leaving his personalty by will, to defendants.

We have repeatedly pointed out that evidence of claimed oral statements of a decedent should be closely scrutinized and cautiously received because it is not susceptible of denial and the witness may not have been capable or desirous of accurately relating what decedent may have said. Cole v. Hartford Acc. & Ind. Co., 242 Iowa 416, 422, 46 N.W.2d 811, 815, and citations, especially Byers v. Byers, supra, 242 Iowa 391, 404-406, 46 N.W.2d 800, 807, 808. Substantially all the testimony for plaintiffs, including that given by Lloyd Halleck, comes within the above rule.

Evidence of claimed admissions or declarations of M. D. Bell is circumstantial and inferential only. Vanston v. Rupe, supra, 244 Iowa 609, 620, 57 N.W.2d 546, 552, and citations.

It is unnecessary to refer in detail to the testimony for defendants. They lived on their farm about two and one-half miles from the Bell farm. M. D. Bell was a half brother of Mrs. Pierschbacher's father. Mr. Pierschbacher farmed the Bell farm the five years after Earl Bell left until M. D. Bell died. Mrs. Pierschbacher did Mr. Bell's washing, helped care for his house and helped some with the farming during those years. Their daughter, twenty-three at time of trial, stayed and worked at the Bell home the last four years Mr. Bell lived. She did the outside chores as well as the housework for one dollar a day and her board and room. Mr. Bell was pleased with the way defendants farmed the place and the care given him by defendants and their daughter.

There is competent direct testimony that when Earl left the farm Mr. Bell proposed to defendants that they farm the place

and care for him as long as he lived and if they would do so he would leave the farm to them. There is also evidence of declarations and admissions against interest of M. D. Bell that furnish some corroboration for the direct testimony. M. D. Bell carried out such an arrangement by making his last will on September 4, 1948, which left all his property to defendants except $5 each to Earl and Wheeler Bell and a watch to Lloyd Bell. This was followed by a warranty deed of the farm to defendants on September 18, 1948. The deed was held in escrow until M. D. Bell's death by the attorney who drew it and then delivered to defendants as Bell had directed. The last will was duly probated.

The first will M. D. Bell made after that of October 3, 1945, above referred to, was drawn on August 10, 1946, and gave a life estate in the farm to Earl with remainder to Lloyd and divided the personalty equally between Earl and Wheeler Bell. This was followed by a will on May 26, 1947, which gave everything to Lloyd who was then away in the service.

In considering the case we have ignored testimony of the parties to the action in regard to any personal transaction or communication between the witness and decedent, M. D. Bell over objection that the witness was incompetent under section 622.4, Code, 1950, which provides: "No party to any action * * *, nor any person interested in the event thereof * * * shall be examined as a witness in regard to any personal transaction or communication between such witness and a person at the commencement of such examination deceased, * * * against the executor, administrator, heir at law, next of kin, assignee, legatee, devisee, or survivor of such deceased person * * *."

Unquestionably defendants are entitled to the protection of this statute since they are legatees and devisees under the probated will of M. D. Bell and claim as such. They do not claim merely as grantees of the deed. Further, the executor of M. D. Bell is a defendant. Luthy v. Seaburn, 242 Iowa 184, 187, 46 N.W.2d 44, 45-46; Johansen v. Davenport Bank & Trust Co., 242 Iowa 172, 175, 46 N.W.2d 48, 50; Crawford v. Couch, 234 Iowa 1246, 1254, 15 N.W.2d 633, 637.

We assume, without deciding, plaintiffs claim as assignees of M. D. Bell and as such are also within the class protected

by section 622.4. Unless plaintiffs are assignees of M. D. Bell and claim as such they seem not to be entitled to the protection of this statute. Benson v. Custer, 236 Iowa 345, 352, 17 N.W.2d 889, 892. While Earl Bell is an heir of decedent he does not claim as such and could not therefore, as heir, invoke 622.4. O'Brien v. Biegger, 233 Iowa 1179, 1210, 11 N.W.2d 412, 426; Cowan v. Allamakee County Benevolent Soc., 232 Iowa 1387, 1390, 8 N.W.2d 433, 435, 436, and citations; 58 Am. Jur., Witnesses, section 328; 70 C. J., Witnesses, section 367.

Defendants' two daughters, however, were not incompetent witnesses under section 622.4. They are not parties to the action and are not interested in the event thereof, within the meaning of the statute. Schmidt v. Schurke, 238 Iowa 121, 124, 25 N.W.2d 876, 878; Maasdam v. Estate of Maasdam, 237 Iowa 877, 894, 24 N.W.2d 316, 325; Campbell v. Kerr, Iowa, 173 N.W. 66; Robertson v. Campbell, 168 Iowa 47, 50, 147 N.W. 301; Bird v. Jacobus, 113 Iowa 194, 198, 84 N.W. 1062; 70 C. J., Witnesses, section 324; 58 Am. Jur., Witnesses, section 288.

Plaintiffs' argument that they scrupulously avoided any testimony which violated section 622.4 cannot be accepted. Substantially all the evidence of Earl Bell was offered over defendants' standing objection of incompetency under the statute and as to quite a little of it the objection was good. For example, Earl's answer, "During that time * * * I did not receive any compensation for my work upon the Bell farm", was vulnerable to the objection. A witness testifies to a personal transaction no less when he denies it than when he affirms it. In re Estate of Stratman, 231 Iowa 480, 483, 1 N.W.2d 636, 640, and citations; annotation 8 A. L. R.2d 1094, 1100, 1101.

Aside from the insufficiency of proof of the oral contract alleged by plaintiffs we think the decree as to the farm should be upheld on the ground defendants are subsequent purchasers for a valuable consideration without notice of plaintiffs' claim. This issue is sufficiently raised in defendants' pleadings.

The proof shows no knowledge by or notice to defendants of plaintiffs' claim until this action was commenced after the final report of the executor of M. D. Bell was filed. This was more than eight months after Bell's death when defendants had fully

performed their agreement with him under which the deed was made. It appears the value of the 120 acres when Mr. Bell died was about $6500 and the services performed by defendants pursuant to their agreement with decedent were somewhere near that value.

By caring for M. D. Bell and farming the place until his death, in accordance with the pre-existing agreement between defendants and Bell made shortly after Earl left the farm, defendants paid valuable consideration for it. We have frequently held the term "purchase money", as used in the statute of frauds, sections 622.32, 622.33, Code, 1950, includes the performance of services in the future under a promise so to do when the services are thereafter performed. Vanston v. Rupe, supra, 244 Iowa 609, 619, 57 N.W.2d 546, 552, and citations.

We see no reason why the rule just referred to does not apply to such a case as this. This view finds support in Larkins v. Howard, 252 Ala. 9, 11, 39 So.2d 224, 225, 7 A. L. R.2d 541, 543, where it is said: " * * * with her full performance of her agreement, on the death of the testator and the due probate of the will, her equities therein ripened into a full legal title as against all equities and claims not known to her or notice of which she was not legally chargeable. She is therefore protected in her title against the claim which appellee makes under the unregistered deed by the rule governing bona fide purchasers."

The editors of A. L. R.2d inform us that the next to the last sentence in the annotation to Larkins v. Howard, supra, 7 A. L. R.2d 544, 545, should read: "While the unrecorded conveyance was voluntary, it does *not* seem likely that a different decision would have been reached if it had not been a voluntary one, in view of the fact that the devisee was regarded as a bona fide purchaser for value." The word "not" was omitted, through inadvertent error, from this sentence as it appears in the annotation.

The following decisions, with brief quotations from some of them, also hold that services performed by a grantee under a pre-existing contract therefor constitute valuable consideration within the doctrine of innocent purchaser. No author· ity to the contrary has come to our attention.

Garner v. Boyle, 97 Tex. 460, 464, 79 S.W. 1066, 1067, states: "The services rendered by Boyle under the contract constituted a valuable consideration sufficient to support the plea of innocent purchaser * * *." Norton v. Ball, Tex. Civ. App., 225 S.W. 581, 583, is to like effect.

Glover v. Coit, 36 Tex. Civ. App. 104, 110, 81 S.W. 136, 139, says: "* * * the legal services rendered by appellees * * * were valuable considerations, upon which they may invoke the rights of innocent purchaser." Tobin v. Benson, Tex. Civ. App., 152 S.W. 642, 644, is a similar holding.

Northrup v. Coon, 154 App. Div. 337, 340, 138 N. Y. S. 1044, 1046, states: "An agreement to support one for life, actually executed, is without doubt a valuable consideration, which will sustain the right of a grantee to a deed taken without notice of an unrecorded deed."

Plaintiffs attempt to meet the issue of bona fide purchaser by quoting this from 55 Am. Jur., Vendor and Purchaser, section 741: "Promise to Support or Pay Profits. A conveyance in consideration of the future support of the grantor for life, although a good consideration in the ordinary sense, is not such a valuable consideration as will entitle the grantee to protection as against secret equities binding the land in the hands of the grantor."

A like statement appears in 66 C. J., Vendor and Purchaser, section 926. Our holding is not contrary to these statements or the decisions cited in support of them. They are not applicable here. It may be conceded the deed to defendants in consideration of the future care of decedent and his farm did not constitute defendants bona fide purchasers. But when the care had all been furnished without notice of plaintiffs' claim, defendants occupied that status.

The authorities cited by plaintiffs accord with the settled rule that an unperformed obligation is not value sufficient to make one a purchaser for value entitled to hold free from prior equities of which he has no notice. So it has been repeatedly held that actual payment of the purchase price before notice is necessary to constitute one a bona fide purchaser. As sometimes said, a purchaser without notice, to be entitled to protection, must be such not only at the time of the contract or conveyance but also at the time the purchase price is paid.

See in support of these propositions Kitteridge v. Chapman, 36 Iowa 348; Sillyman v. King, 36 Iowa 207, 213; Morse v. Rhinehart, 195 Iowa 419, 421, 192 N.W. 142; Reining v. Nevison, 203 Iowa 995, 1000, 213 N.W. 609; Egbert v. Duck, 239 Iowa 646, 652, 32 N.W.2d 404, 407, 408; Coastal Transit Co. v. Springfield Bus Terminal, Inc., 302 Mass. 513, 20 N.E.2d 1, 4, 124 A. L. R. 1254, 1258, and annotation 1259; La Fon v. Grimes, 5 Cir., Texas, 86 F.2d 809, 109 A. L. R. 156, and annotation 163; 55 Am. Jur., Vendor and Purchaser, section 747; 66 C. J., Vendor and Purchaser, section 909.

Many of these authorities recognize that performance of the purchaser's obligation before notice of prior equities entitles him to protection therefrom. "* * * in so far as he has performed before notice, he is entitled to be protected * * *." Annotation 124 A. L. R. 1259, 1261. "The cases all agree * * * that payment in full of the consideration before notice, entitles the purchaser to protection to the full extent of the estate purchased." Kitteridge v. Chapman, supra, 36 Iowa 348, 351, a leading case repeatedly cited with approval by this and other courts.

This case falls within the familiar rule that one who purchases real property from the holder of the legal title and takes a conveyance and pays a valuable consideration for it without notice of outstanding equities takes it divested of such equities. The Farmers National Bank of Salem v. Fletcher, 44 Iowa 252, 256; Block & Pollak Iron Co. v. The Holcomb-Brown Iron Co., 105 Iowa 624, 627, 75 N.W. 499, 67 Am. St. Rep. 319; Freligh v. Billmeyer, 231 Iowa 1307, 4 N.W.2d 392; Egbert v. Duck, supra, 239 Iowa 646, 651, 32 N.W.2d 404, 407.

Section 558.41, Code, 1950, commonly referred to as the recording act, provides: "No instrument affecting real estate is of any validity against subsequent purchasers for a valuable consideration, without notice, unless filed in the office of the recorder * * *."

Obviously plaintiffs have no greater rights under the oral contract upon which they rely than they would have under an unrecorded written instrument. Rules for determining who are bona fide purchasers entitled to protection against prior

equities are the same as those for determining what purchasers are entitled to protection under a recording act. 55 Am. Jur., Vendor and Purchaser, section 652; 66 C. J., Vendor and Purchaser, section 987, pages 1148, 1149.

On the question of burden of proof in this class of cases see Young v. Hamilton, 213 Iowa 1163, 1171–1173, 240 N.W. 705: annotation 107 A. L. R. 502, 523–527.—Affirmed.

All JUSTICES concur.