WARD W. CURRIE, plaintiff-appellee, v. MAE F. CURRIE, appellant; VELDA CURRIE, cross-defendant-appellee.

No. 49343.

(Reported in 90 N.W.2d 13)

MAY 6, 1958.

REHEARING DENIED SEPTEMBER 19, 1958.

Smith & Hanson, of Emmetsburg, and Cook & Drake, of Glenwood, for appellant.

Smith, Peterson, Beckman & Willson, of Council Bluffs, for plaintiff-appellee.

BLISS, J.—Ward W. and Mae F. Currie, each, at the time of the trial of this action in the early months of 1957, was about fifty-five years of age. They were married February 18, 1922. Ward started farming for himself in 1919 when he was nineteen years old. Mae had graduated from the high school in Missouri Valley. Prior to her marriage to Ward she had taught school in the grades from the second to the eighth inclusive for three years. She taught three months after her marriage, and later did some substitute teaching. Ward had some farm equipment when they married and Mae brought about $1500 into the common household fund for family use.

Four children were born to them, including twins who died. A son and a daughter matured and were not in the parental home at times pertinent to this litigation. The parents lived together as farm operators for thirty-one years. Mae did the housework, gardening, yardwork, some work in the fields, and looked after the poultry. Ward was busy in the general farm work. They were moderately prosperous. The first land that Ward bought was a tract of about seventy acres in Section 9, Township 77, Range 44, in Pottawattamie County, Iowa. It was purchased April 4, 1942, for $7000, and is south and east about a half mile from the buildings on the land involved in this litigation, which is referred to in the record as the "home place." The title to this seventy acres was taken in the name of Ward W. Currie and has so remained. The land involved in this action was bought by the father and mother of Ward in 1896 and was their homestead for over fifty years and until they sold it to Ward W. Currie on April 10, 1946. This land, which is referred to as the "97-acre" tract, contains "77 actual farming acres." The deed from Ward's parents was recorded April 13, 1946, and was later re-recorded on May 1, 1946, to correct an error. The material parts of said deed show that J. A. Currie and Josephine Currie, husband and wife, in consideration of $14,000 paid by Ward W. Currie and Mae F. Currie, conveyed to said purchasers, husband and wife, or to the survivor, as joint tenants, and not as tenants in common, the following described real estate situated

in Pottawattamie County, Iowa, to wit: All that part of the Northeast Quarter of Section 4, Township 77 North, Range 44, West of the Fifth P.M., lying west of the center of Willow Creek, and the south 67 acres of that part of said quarter section lying east of the center of Willow Creek.

Defendant testified that she was not present when the deed was executed and had never discussed it with plaintiff previously. On the day the deed was executed plaintiff borrowed $6000 from the Peoples State Bank of Missouri Valley, Iowa, to pay his parents the balance of the purchase price. He was the sole maker of the note and made all the payments to the bank to satisfy the note. It was received in evidence in the trial of the case on appeal with endorsements noted thereon showing its full payment.

The divorce proceedings of plaintiff and defendant and their preceding and subsequent relations are matters of importance in the instant litigation. Plaintiff bases his ownership of the real estate involved herein on the outcome of said suit, that is, upon the property stipulation and the decree incorporating it.

Defendant, testifying to their first marital trouble, said: "I believe it was in 1927 one time. I left him for four months. There would be other times I left him for one night. I believe it was in 1938. Outside of these two instances until 1953 there had been no particular trouble. Once in March 1952 I asked him if he wanted a divorce and he said he didn't."

Plaintiff was absent from the home about a month between the middle of January and the middle of February 1953. About the latter date defendant testified that plaintiff asked her to sue him for a divorce and she told him she did not wish one and that if he felt that way "he could get a divorce if he wanted it, and he asked me if $25,000 would be all right and I said it would and there wasn't any mention of property or the joint farm. * * * We had two discussions the next Monday morning. On Tuesday, evidently on the 17th [of February], he went in to see Mr. Acrea who drew the divorce stipulation, and the next morning, the 18th, I went in and signed it. I saw the petition that had been drawn and read all of it including the prayer, and I didn't see anything in it about this farm [the joint tenancy farm]. I read the petition in Mr. Acrea's office. Ward took me

to town that morning and he stayed in the car. Prior to this time, except for these two instances, my husband looked after the business affairs of the farm. He raised the crops. He had not made any accounting to me of my one half, and I had not paid anything on account of my one-half ownership. We just kept our money in a joint account [in the First National Bank of Missouri Valley on which both of them drew checks]. I had trust and confidence in my husband. I had known Mr. Acrea all his life. Our families were neighbors. I had confidence in him. As this settlement with my husband approached I did not hire a lawyer and said nothing to my husband about doing so. He just said he was going in to see Mr. Acrea, in whom I had confidence. When I went into Mr. Acrea's office I first read the petition [the divorce petition]. Up to this time nothing had been said to me about the joint farm, the home farm. I had no idea my share of it was to be taken away from me. Mr. Acrea handed me the stipulation and I read it, and when I came to the part about the property, I said, 'Does this affect any property in any way?' He said, 'What property?' And I told him we had a farm in joint tenancy. He was surprised. I don't think he knew anything about it before and he told me it didn't have any effect on it. He did not change the stipulation. I relied on and believed what he said, that it didn't affect my half ownership of this land. I signed the stipulation there that day and took with me a copy of it and of the petition. I told Mr. Acrea before I left that I would talk to Ward about the joint tenancy and he told me to tell him. Mr. Acrea said nothing about my half ownership other than that this stipulation did not affect it."

Before further reference to the testimony of the parties in the quieting-title action before us we will note the proceedings in the divorce suit, which the plaintiff herein introduced in evidence.

The divorce petition, after alleging the matters of jurisdiction and stating the ground of divorce was cruel and inhuman treatment by Mrs. Currie endangering the life and health of Mr. Currie, prayed as follows:

"WHEREFORE, plaintiff prays for a judgment and decree of absolute and unqualified divorce from the defendant, and that

the bonds of matrimony heretofore existing between them be canceled, set aside and held for nought. He further prays for all other and further relief to which he may be entitled in equity."

The stipulation in the divorce proceeding, executed and acknowledged by Mr. and Mrs. Currie before a notary, provided, in the event a divorce was granted Mr. Currie, "that all issues which might be raised by and between the parties relative to the matter of alimony, support money and division of property or property rights between the parties shall be, and they are hereby disposed of as follows, to wit:

"The plaintiff agrees to pay to the defendant, and the defendant agrees to accept in full and complete settlement of all claims that the defendant might have against the plaintiff for support money, alimony, division of property owned by either or both of the parties and dower interest or rights which the defendant might have in and to any of the plaintiff's property, the sum of $25,000 which shall be paid to the defendant in the following manner, to wit: $15,000 on the date of the execution of this agreement, receipt of which is hereby acknowledged by said defendant. $10,000 to be paid on the date of the filing of the judgment and decree of divorce in this action.

"The defendant by the signing of this stipulation hereby enters her voluntary appearance in this action, acknowledges receipt of a copy of plaintiff's petition, waives service of an original notice upon her, and consents that the District Court of Pottawattamie County, Iowa, may take jurisdiction of this action at any time and proceed to hear and determine the same without notice to her.

"The defendant waives all right to any real estate owned by the plaintiff or personal property other than those items which she has already received, and which have been divided by agreement."

The stipulation was signed by both parties and its execution acknowledged on February 18, 1953.

On March 10, 1953, the lamented Charles Roe, Presiding Judge of the District Court of Pottawattamie County, rendered the court's decree of divorce, providing: "* * * this cause now comes on for hearing, the plaintiff appearing by his attorney, K. C. Acrea, and the defendant not appearing in any manner,

and the court having examined the original notice and the service endorsed thereon, expressly finds and adjudges that the defendant has signed and filed herein a sworn stipulation relative to the property and property rights of the parties, and which also contains therein a voluntary appearance and consent to the jurisdiction of court and waiver of service of original notice hereon. The court therefore finds that it has jurisdiction of the subject matter of this action and of the parties thereto as provided by law. IT IS THEREFORE ORDERED AND ADJUDGED BY THE COURT that said defendant be and she is hereby declared to be in default for want of an answer and appearance. And afterwards to wit: March 10 A.D. 1953, it still being of said term, this cause comes on for final hearing and trial before the court, the plaintiff appearing in person and by K. C. Acrea, his attorney, and the court having examined and inspected the pleadings on file herein, and heard the evidence adduced by plaintiff in support of his petition, and being fully advised and satisfied in the premises, finds that the allegations of said petition are true, and that plaintiff is entitled to a decree of divorce, and for such other and further relief as therein prayed."

After granting the divorce, the decree continues: "IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the stipulation filed in this case be, and the same is hereby ratified and confirmed and made a part of this decree as fully and completely as though the same were set out and repeated at length herein, and that the property and property rights of the parties are fully settled and disposed of in accordance with said stipulation. * * *."

The payments of $15,000 and $10,000 provided for in the property stipulation and the decree in the divorce action were duly made by Ward W. Currie, plaintiff-appellee herein, to Mae F. Currie, defendant-appellant. The latter left their farm home, and Ward W. Currie continued to operate it.

As a witness on his behalf, in the action on appeal, Ward testified as follows: "A. She asked for a divorce in March the year before, in '52. Q. What was the substance of that conversation? A. She wanted a divorce and said she wanted $20,000 and give me the title to everything I owned. Q. What did she say at that time about title to the land that's involved in this action? A. Oh, nothing. I don't think there was anything more

said. I said I wouldn't consider it at all as long as I was taking care of a son, unmarried son. My unmarried son, then 19, was living at home at that time. My daughter, Joy, had left home. She was married in 1951 and went to Ames, Iowa, to live. Her name is Joy Reel. She now lives in Harrison County, Iowa— 2½ miles north of where I live. I don't think there was anything more said by Mrs. Currie about a divorce from '52 until the present action for a divorce was commenced."

On plaintiff's return from Texas in February 1953 there was another talk with his wife about a divorce. Concerning it he testified: "Well, we just decided to separate. We agreed on $25,000 and give me title to all the land, all my holdings. Then after the talk with my wife I went to Mr. Acrea to get the divorce papers fixed out. I agreed to pay her $25,000. This was the 17th of February, 1953. At this time Mr. Acrea prepared the petition for divorce and the stipulation. The following day, by arrangement with my wife, I took her in my car to Mr. Acrea's office, and while she was there for about twenty minutes I waited in the car until she came out. I asked her if she signed the deed, and she said they didn't know the description of the land and we would have to mail it to her. I paid her $15,000 on that occasion, before she left, by check on my account on the City National Bank of Council Bluffs." (The canceled check showing its payment on February 18, 1953, was received in evidence. Plaintiff had a balance in the bank on this date from the deposit of cash from corn, beans and wheat sales of $17,024.82. On this date plaintiff also had a balance in the First National Bank of Missouri Valley, Iowa, of $4688.44.)

Respecting the property, plaintiff further testified: "I owned farm machinery and equipment on February 17, 1953, with a fair market value, after taking depreciation, of about $6000. I owned no real estate or personal property except the checking accounts and the machinery; the crops that I sealed; the 70 acres of land and the land that is involved in this controversy. Mae F. Currie, after she left the farm on February 18, 1953, never returned but once, sometime in July 1953 [July 22, 1953], to get her $10,000, which was paid to her, part in checks and the rest in bonds. Exhibit 8 is the check I gave her for the balance of the $10,000. The check for $1641.56 was drawn on

the City National Bank of Council Bluffs. I delivered to her on that date some bonds and a small savings in the City National Bank. The check for $1641.56 was the balance in cash that I owed her after deducting the bonds and savings account."

There is no controversy between the parties as to the agreement to pay $25,000, nor of its payment to the defendant. Their dispute is with respect to the provisions of the property stipulation. Plaintiff contends that in the division of all of their property, both real and personal, defendant was to receive $25,000 in full of her share, and he was to have all of the real estate including that to which he held the title and also that which was held by them in joint tenancy. Mr. Acrea testified that when he prepared the divorce papers he had no knowledge of the joint tenancy property and therefore did not specifically mention it. When he later learned of it from plaintiff he instructed him to procure a deed of it from defendant. Mr. Acrea prepared a deed conveying the land in controversy to plaintiff and mailed it to defendant's daughter, to be forwarded to defendant for execution, since the latter's address was not known. When plaintiff and defendant met on July 22, 1953, he asked her where the deed was, and "she said she lost it and—or misplaced it and I would have to make out another." Another deed was later mailed to defendant.

As a witness in this suit defendant testified that she received the first deed and then had it in her possession. Plaintiff testified that he learned for the first time, about the last of May 1955, that defendant was making claim to the property in controversy when Mr. Smith of the law firm of Smith & Hanson, attorneys herein, called on him with some papers for him to sign to show defendant's ownership of this real estate. Plaintiff did not sign the papers and referred Mr. Smith to his attorneys.

Plaintiff has occupied the premises involved since February 18, 1953, and has paid the taxes on it, interest on the encumbrances, income taxes, expenses and upkeep of all kinds, and defendant has made no contribution thereto. There is no evidence that she had received any returns from the land.

Velda Currie and plaintiff were married December 15, 1954, and she has assisted in the farming operations since. Plaintiff added to his farm 200 acres thereafter and made improvements

to the house, added a garage and a breezeway, a utility room with a half bath downstairs and a new bath upstairs, took out old partitions and put in new knotty pine partitions, new rugs and drapes, moved one of the buildings and rebuilt another. For these acquisitions and improvements since 1954 he and his present wife encumbered the property to the extent of $29,500.

Defendant testified that plaintiff had never made any accounting to her of the crops made on the joint tenancy property, nor had she ever demanded any rent for any part of it. Asked why she had not done so, her answer was: "Well, I had thought we could have a reconciliation and I didn't want to cause any trouble." There is no evidence that their relations, if any, supported any basis for a reconciliation. She had been working at Boone, Iowa, and elsewhere in north Iowa for two or more years. In answer to whether she had seen plaintiff during that period, she replied: "Oh, I was at his father's one day when he came in and sat down about a half hour, but he didn't say anything to me." Neither did she say anything to him.

Defendant testified that when she called on plaintiff, on July 22, 1953, to get the $10,000 remaining unpaid of the $25,000 provided for in the divorce stipulation and decree, he asked her to sign the deed which had been sent to her, and that without making any excuse for refusing she told him she would not sign it, and without any further talk about the farm he paid her the $10,000.

Plaintiff filed his petition in the suit on appeal to quiet title in himself to the real estate in controversy, on June 13, 1955, to which defendant, on August 25, 1956, filed a substituted answer, counterclaim and cross-petition for a decree quieting title in herself as against the plaintiff and the cross-defendant, Velda Currie. In these pleadings defendant admits the payment to her by the plaintiff of $25,000, but denies that for said sum or any settlement in the divorce action she was to release any interest in the real estate. Defendant alleges in Division I of her answer that the petition does not state a cause of action for the reason that the stipulation and decree in the divorce action do not by their terms give or convey to plaintiff any interest of the defendant as joint tenant of the real estate. In Division II of her answer defendant alleges that the stipulation

in the divorce action is ambiguous and conflicting in that it does not clearly state the disposition of said land, and that a practical construction of the stipulation by the parties was to the effect that it does not affect the title to the property held in joint tenancy, and that when defendant signed said stipulation she was not apprised by the petition in the divorce action that plaintiff made any claim to any interest in defendant's real estate, and that to so construe the stipulation and decree in the divorce action would be unreasonable and inequitable under the circumstances. Defendant further averred in her answer that if the stipulation does affect said real estate it was entered into by mutual mistake or induced by false and fraudulent representations of plaintiff and his attorney. The answer of defendant also alleges that the decree in the divorce action was obtained by perjured testimony, in that the plaintiff claimed to be a dutiful and loving husband, when in fact he had been living in adulterous relations with a woman not his wife, which if defendant had known thereof would have been material in the property settlement. As further answer defendant alleged that plaintiff and his attorney, K. C. Acrea, presented the stipulation in the divorce action knowing full well the intention of the defendant and the construction placed thereon by the parties, and failed to call the matter to the attention of the court, and thereby were guilty of a fraud upon the court and upon the defendant.

Other allegations in defendant's answer were that plaintiff was estopped to claim that the divorce stipulation vested in the plaintiff all right to the land held in joint tenancy by the plaintiff and the defendant "in that the plaintiff did, by his agent, inform the defendant that the stipulation did not affect the defendant's interest in the property held in joint tenancy, and plaintiff recognized defendant's claim and agreed that defendant's construction was correct and failed to act to assert the claim now made by him."

Defendant's counterclaim, based upon allegations substantially similar to those in her answer alleges: "That defendant is without legal remedy, and in bringing this action she invokes the inherent equitable powers of the court to obtain relief hereinafter prayed for notwithstanding more than one year has

passed since the entry of the court's decree, and unless relief is granted her herein plaintiff will be permitted to profit and benefit by his fraud.

"WHEREFORE, for Division I of her counterclaim herein, the defendant prays that the case heretofore filed in this court, entitled Ward W. Currie vs. Mae F. Currie, Docket No. 17-561 [the divorce action], be reopened and a new trial granted therein on all issues and matters pertaining to alimony and the adjustment of property rights of the parties, to the end that the stipulation entered into between the parties in said case be modified, corrected and reformed to the extent that it clearly express that plaintiff therein does not thereby acquire any interest of the defendant in the jointly owned property above described."

In Division II of defendant's counterclaim she alleges that she is the absolute owner in fee simple of an undivided one-half interest, as joint tenant, of the real estate, to wit:

"All that part of the Northeast Quarter of Section 4, Township 77 North, Range 44, West of the Fifth P.M., lying West of the center of Willow Creek.

"The South Sixty-seven (67) acres of that part of the Northeast Quarter of Section 4, Township 77 North, Range 44, West of the Fifth P.M., lying East of the center of Willow Creek. The tract containing 67 acres, more or less, according to Government Survey."

Defendant then prays that title to the land just above described be fully quieted and established in her.

On December 28, 1956, K. C. Acrea withdrew his appearance as one of the attorneys for the plaintiff in the action before this court on appeal.

On December 31, 1956, the plaintiff-appellee, Ward W. Currie, filed a reply to defendant's substituted answer in which he denies every allegation in Division I of defendant's substituted answer in anywise inconsistent with the allegations of plaintiff's petition. And for further answer denies that defendant Mae F. Currie was induced by any false and fraudulent representations by himself or his attorney, K. C. Acrea, to sign the stipulation in the divorce action, and avers that the plaintiff and defendant in said action freely and voluntarily agreed upon

a just and reasonable settlement of all property and property rights, and, after said agreement was made, Mr. Acrea caused the agreement to be reduced to writing, which was signed by the parties, and plaintiff pursuant thereto paid defendant in full of all property and property rights the sum of $25,000, as agreed upon, and Mae F. Currie accepted same strictly in accord with the agreement.

For further answer plaintiff states that defendant at all times knew the extent of plaintiff's assets and proposed that she would accept said sum of $25,000 in full of all claims to any and all property (real, personal and mixed) owned by the parties jointly and severally, and Mae F. Currie is estopped to deny said agreement, having received all payments thereunder.

The answer of plaintiff also alleges that the defendant is activated by improper motives and is not acting in good conscience, or good faith and has not exercised reasonable diligence; the parties occupied the real estate herein as their homestead since its acquisition and until the signing of said stipulation; upon the execution of said stipulation and the first payment of $15,000 the plaintiff has continuously occupied said property as his homestead; upon the signing of said stipulation the defendant abandoned said real estate and it is now the homestead of plaintiff and the cross-defendant, Velda Currie; in reliance upon the stipulation and the divorce decree the plaintiff has made improvements on said property in excess of $10,000; since he acquired the property on April 10, 1946, he paid $6000 as the balance of the purchase price and defendant paid no part thereof; the payment of $25,000 made under the stipulation was in excess of one half of all of plaintiff's property, including the jointly owned property; plaintiff has paid all charges incident to its acquisition and ownership; and that on June 15, 1956, plaintiff conveyed the real estate involved herein to himself and his wife, Velda Currie.

Plaintiff's answer to defendant's counterclaim, in general, is a denial of its allegations, and of any ambiguity in the property settlement in the divorce action or any fraud in its procurement, and alleges lack of jurisdiction to grant a new trial in the divorce action between the parties.

1296

Mr. Acrea, testifying for plaintiff, stated that as attorney for the latter he prepared the petition and the property stipulation in the divorce action on February 17, 1953, at which time plaintiff told him what the settlement was that he had made with his wife and that she would come to Mr. Acrea's office the next day and sign the stipulation; that Mrs. Currie did come unattended to his office on February 18, 1953. Asked what was said and done at this time, he answered:

"There wasn't a great deal said. I knew both the parties. I had done work for Ward and his wife to some extent and other matters, income tax. I knew of course that she was coming in and what she was coming for. I handed her the petition and the stipulation and she read them over. There was no particular comment made about it and she signed the stipulation and I put my seal on it and she left, with a copy of the petition and a copy of the stipulation. Q. Was there any talk at that time in your office between you and Mrs. Currie as to the status of any property in joint tenancy? A. None whatsoever. Q. Did she on that occasion or at any time ask you any questions with reference to any property in joint tenancy or for any legal explanation of any effect which this stipulation might have upon any property owned in joint tenancy? A. She did not. She asked me no questions whatsoever concerning it. Q. What is the fact, Mr. Acrea, as to whether or not on that occasion or any other occasion you made representations to Mrs. Currie that said stipulation did not affect the title to property held in joint tenancy? A. I made no such representations. In fact, I am sure I have never talked to her about any phase of it since she left the office, nor with reference to any joint tenancy of property."

Mr. Acrea testified that he drew the two deeds to the real estate involved herein which were sent to defendant.

On cross-examination, the witness stated: "I am quite sure that the 18th of February, 1953, was the only time that Mae F. Currie was in my office respecting this matter. I think Mr. Currie signed the stipulation the same day he signed the petition. When I drew the stipulation I didn't know then of this joint tenancy ownership. The stipulation had been signed for several weeks before I found out about it. I knew of it when

I had the divorce decree signed. I had known Mrs. Currie for a long time. The only business I recall doing for her was making out their income tax returns since 1948.

"On February 18, 1953, she came to my office without a lawyer. I represented her husband. I presented her with the petition for a divorce in a friendly manner. There was very little conversation at all. She was somewhat distressed. I knew what she came for. I handed her the papers and she read them and signed them. I don't remember whether there was any talk about the payment of $25,000. She read the stipulation that is what it provided for.

"I told Mr. Currie that since I had learned of this condition of the title about which I knew nothing before, at the time the petition was filed, that he should not pay her the final $10,000 until she signed a deed relinquishing her interest.

"When Mrs. Currie was in my office she read the stipulation. At the time I prepared the stipulation it was my understanding that it was the agreement between the parties, that she was to receive $25,000. That is all she would ever claim in the way of property, property rights, alimony, support money, and other matters connected with their property. Q. Well, of course, you didn't intend when you drew this stipulation to provide against her half ownership in this joint property, did you? A. I knew nothing about it. Q. And did you in any talk that you had with Mrs. Currie make any mention of the fact that she was to surrender her half interest in this joint property? A. There was none."

■■ I. We set out the evidential record with respect to the facts with more than customary fullness because it is the controlling factor in the determination of this appeal. There are no controversial questions of law involved. Appellant offers no testimony other than her own in support of the allegations of her voluminous pleadings and the relief prayed for therein. Much of it is directly contradicted by the testimony of Mr. Acrea. The verity of their testimony on the disputed matters is strongly supported by the undisputed evidence of appellant's conduct after her separation and divorce from Mr. Currie. After these events over a period of more than two years she had only two or three contacts with him. After she left the farm home

she did not return to it until July 22, 1953, when she came for the $10,000, the last installment of the agreed-upon settlement of $25,000. She never thereafter returned to the farm which she left in his possession. She had no rental agreement with him for the property to which she seeks to quiet title in herself. Mr. Currie operated the farm for over two years and she made no demands upon him for any rental or any share in the crops. She paid no part of the taxes, insurance on the buildings, upkeep of the premises, or operating expenses. In her State and Federal income tax reports she made no deduction for depreciation of the improvements. All the expenses of ownership and operation of all of the real estate were paid by Mr. Currie without any contribution or offer of contribution by the defendant-appellant. We are abidingly convinced that the suit of Mae F. Currie for a decree to quiet title in herself to the real estate involved is without merit. The soundness of our conclusion and conviction is strengthened and fortified by the decree of the able trial court who heard and observed the witnesses in the trial below. The suit is triable de novo in this court on the facts and the law, and we are not bound by the decree of the trial court, but in many decisions this court has held and recognized that under like situations such decree is entitled to serious consideration and weight. This is especially true where there is conflict in the testimony or the veracity of witnesses or credibility of testimony is concerned. Chader v. Wilkins, 226 Iowa 417, 421, 284 N.W. 183; Pyle v. Stone, 185 Iowa 785, 791, 171 N.W. 156; Thompson Brothers v. Phillips, 198 Iowa 1064, 1067, 200 N.W. 727, 729 ("* * * the trial court, having the witnesses before him, enjoyed an advantage over our perusal of the printed record, and where we feel justified in giving some weight to his conclusion * * *."); Owen v. Wilden Hospital, Inc., 245 Iowa 382, 388, 62 N.W.2d 186, 190 ("While our review is de novo, we must give considerable weight to the findings and decree of the trial court, especially on conflicting testimony."); Bell v. Pierschbacher, 245 Iowa 436, 439, 62 N.W.2d 784, 786 ("The case involves quite largely fact questions which the trial court was in better position than we to decide."); Blum v. Keene, 245 Iowa 867, 899, 63 N.W.2d 197, 214 ("While this court reviews the facts and the law anew in an appeal of this kind

and is not bound by the findings of the trial court, yet we give weight to its findings of both law and fact, and particularly to findings of fact where the credibility of the testimony of witnesses has an important bearing.") ; Huffman v. Hill, 245 Iowa 935, 938, 65 N.W.2d 205; Steere v. Green, 247 Iowa 1085, 1088, 1089, 77 N.W.2d 924; Stooker v. Feil, 240 Iowa 876, 877, 37 N.W.2d 918; Thompson v. Thompson, 240 Iowa 1162, 1170, 1171, 39 N.W.2d 132, 137 ("Our confidence in the rightness of that conclusion is confirmed by the findings, conclusions and decree of the able trial court.") ; England v. England, 243 Iowa 274, 278, 51 N.W.2d 437, 440 ("Of course we are justified in giving weight to the findings of the trial court, especially since the credibility of witnesses and defendant's good faith are largely involved.") ; Hilliard v. Hilliard, 240 Iowa 1394, 1398, 39 N.W.2d 624; Keplinger v. Barer, 234 Iowa 1135, 1137, 1138, 15 N.W.2d 284.

It is our conclusion that the judgment of the trial court should be and it is—Affirmed.

All JUSTICES concur except SMITH, J., not sitting, and PETERSON, C. J., who takes no part.