WILLIAM BLUM et ux., appellees, v. DONALD J. KEENE et ux., appellants.

No. 48346.

(Reported in 63 N.W.2d 197)

868

MARCH 9, 1954.

REHEARING DENIED MAY 7, 1954.

F. D. Gilloon, Sr., and O'Connor, Thomas, McDermott & Wright, all of Dubuque, for appellants.

E. J. Kean and Becker, Klauer & Heffernan, all of Dubuque, for appellees.

BLISS, C. J.—On June 7, 1951, defendants executed two instruments, one conveying by warranty deed to plaintiffs Lots

119, 120 and 121 in Linehan Park Addition in Dubuque Township, in Dubuque County, Iowa, on which there were two buildings; the other instrument was a bill of sale conveying to plaintiffs certain described personal property used in the operation of a motor vehicle service station, garage, restaurant, and lodging rooms by defendants on said property. The consideration in each instrument was "one dollar and other valuable considerations in hand paid", by plaintiffs. Each was duly signed and acknowledged by defendants and filed for record by Mr. Blum on the day of execution. Possession was to be given, as appears from testimony for plaintiffs, within thirty days, or by July 7, 1951. Defendants having refused to surrender the property, the petition of plaintiffs was filed August 17, 1951, and upon answer being filed alleging that the instruments did not and were not intended to convey absolute title, but were in fact mortgages to secure indebtedness owing plaintiffs by defendants, the justice of the peace, on motion of defendants, under section 601.37, Code of 1950, transferred the action to the district court.

At a pretrial conference the parties stipulated that the only issue to be tried and determined was whether the deed and the bill of sale conveyed absolute title to the properties described in each instrument to plaintiffs or whether they were given to secure indebtedness to them.

It was also stipulated, first, that if the court found the instruments were absolute conveyances, it should find and determine that plaintiffs have the right to possession of the property described in each, and the reasonable rental value of the same for the time they had been wrongfully deprived of its possession; and second, that if the court found that said instruments were given only for security purposes, then it will determine the amount of the indebtedness owing plaintiffs, and so secured, and render judgment accordingly.

Plaintiffs, at the trial for their main case, introduced the warranty deed and the bill of sale, and the testimony of one witness that in his opinion the fair and reasonable rental value of the property involved was $150 a month.

For their main case defendants introduced the testimony of Mr. and Mrs. Keene and two witnesses as to property values.

The court ordered, adjudged and decreed that plaintiffs had fee simple title to the real estate, title to all personal property located thereon, were entitled to possession of said real estate and personal property, and that a writ of execution be issued depriving defendants of possession and placing plaintiffs in possession. The court also found that the reasonable rental value of the real estate was $150 a month and that plaintiffs have judgment against defendants in the sum of $2750 for such rental from July 7, 1951 to January 17, 1953, the date of the judgment and decree.

The facts are controlling and determinative of the case and the de novo appeal, and the credibility of much of the testimony is an important factor in appraising its probative worth.

The printed record before us has 385 pages, much of it by question and answer, presumably on the theory that the truth of the testimony may thereby be better ascertained. Appellants' opening argument has 110 pages and their reply 87 pages.. Appellees' brief and argument contains 95 pages. There have been certified to this court the reporter's transcript of 471 pages, a voluminous transcript of all proceedings in the lower courts, and numerous exhibits.

The parties are all adults, but their ages are not shown. All parties are residents of Dubuque County. Mr. Blum was in the coin-operating-machine business, consisting of mechanical amusements of various kinds, all operated and played by the insertion of coins, such as music boxes, pin games, shuffle alleys, shuffle bowling machines and other similar types. He serviced his own machines and also like machines of others. He owned a majority of such machines in that locality—between 100 and 120 of them. He both sold and leased them. He did not own nor operate slot machines of the "one-armed bandit" type.

Defendant Donald J. Keene, before World War II, owned his home and worked in a meat-packing plant. On his return from service in that war early in 1944 he acquired a tavern for $4000, known as "The Tops Tavern", which he operated for about two years and then sold the tavern, without the stock of merchandise, for $8000. The stock he sold to others for "$1000 or $1500", he was not sure which. His wife testified he received $4000 for the stock.

He then bought the three lots involved in this litigation. The real estate in that locality has disadvantages. Much of it is swampy. He indicated that one of these lots, No. 119, was not of much value, as it was swampy and had a deep hole. He said he acquired it by quitclaim deed, and that he paid $800 for the other two lots. The abstract, offered by defendants, shows that he acquired the three lots by one deed for one dollar and other valuable consideration, dated September 30, 1946. Prior to this time and in 1932 the State Highway Commission had condemned the westerly 16 feet of Lot 121, for highway purposes. The plat of the addition shows that the real estate involved lies east of and abuts on highway 52 for 100 feet, and has a depth of 46 feet. Donald Keene had a truck and in the earlier months of 1946 and prior to receiving his deed to the lots he began filling them to a depth of from six to twelve feet, and with what he hauled himself and bought from others he put in about 2500 truckloads, worth, as he testified, about $3 a load. He said he kept track of the loads on a sheet of paper in the cab of the truck.

On this fresh fill he began the construction of the main building about July 1946, the dimensions of which were 50 feet in length and 30 feet in width or depth. He did the construction work himself and with such labor as he hired. He put in a concrete foundation five feet high and eight inches thick except in front, where it was a foot thick and reinforced. A concrete floor, four inches thick, was put in the basement. He needed money to do the filling and construction work and early in 1946 began borrowing money from Mr. Blum, in periodic sums of from $200 to $500. It was done in a rather lax way. Either Keene or his wife would go to the Blum home and if Mr. Blum was not there Mrs. Blum would attend to the matter. A blank check would be torn from a pad which Mr. Keene would sign, or if it was Mrs. Keene she would sign, and Mr. or Mrs. Blum would insert the details and the amount borrowed. This borrowing was kept up in 1946 until the Keenes had received $4250 from plaintiffs. There is no evidence that they refused to loan any more. In fact he loaned defendants money on their car in 1947.

While these evidences of indebtedness to the plaintiffs were noted on blank checks, they were not in fact checks drawn by Mr. Keene or his wife on any bank in which they or either of them had a checking account. There was no such checking account. These slips of paper were simply memoranda signed by either of them as evidence of the borrowings. They were in fact receipts for sums borrowed. Neither defendant contended otherwise. Mrs. Keene testified: "The oil station started in operation in October of 1946 with the Coryell Company, but our building wasn't completed at that time. At that time we had the basement finished and we were starting on the first floor. We didn't have enough money at that time to finish the building, that is to put on the second story. We eventually completed the second story with the help of money loaned to us. The first money that was loaned to us came from William Blum and Dorothy Blum. We got $500 sometimes and then $200 and it would depend on the amount we would need to pay the bill at the time we got the materials. I don't know for sure but I believe all these advances were in 1946. At the time these cash advances were made I signed a blank check which wasn't dated at the time; being we didn't have an account it wouldn't be legal. I went and got some money from Mr. Blum at times when my husband was busy building and didn't have time to go and get it. We would go to Mr. Blum's home. I didn't go with my husband each time he went to get money. I can't say how many times I went to the Blum home to get money, but I remember at least three times. He paid us in cash but I signed the checks for the amount. Either his wife or him, if he wasn't home his wife would give me the money. They would give me the cash and I would sign the check."

And Mr. Keene testified about these blank checks on which he signed his name as follows: "They was not really a check. They just was more or less a receipt that I owed him money on them. They was made out on a check blank, but at the same time they was more or less for a receipt."

The main building was completed in January 1947. Prior to its completion Mr. Keene had tried to get a G.I. loan on the property from the State Bank of East Dubuque, Illinois, but it

refused because the building was not completed. But on January 7, 1947, this bank loaned the defendants $4000 drawing 4% annual interest on their promissory note, payable in monthly installments of $60, and secured by mortgage on the real estate involved herein. This money was used to pay outstanding indebtedness for the construction of the main building.

Defendants made no voluntary payments on the money borrowed from the plaintiffs. Both defendants testified that the plaintiffs had never pressed them for payment. There is no evidence that they ever asked them for any payment on the principal or any payment of interest. In fact Mrs. Keene was asked: "And during the time from 1946, did you pay him back anything?" Answer: "No. He stated he didn't want it. My husband was going to pay it back to him when he got the mortgage from the East Dubuque bank, but he said not to."

But on May 28, 1950, Mr. Keene came to Mr. Blum's office all excited and said that the dealer who had sold him his new car a few weeks back was going to repossess it because of a delinquent payment, and he asked Mr. Blum to loan him the money. Blum told him that he would not give him a cent, as he had never paid anything on the $4250 that he had owed him for four years. Keene admitted this but said he never had the money to pay. Blum then told him that he was not going to depend any longer on the blank checks he was holding and that he had contemplated suing him. Keene then said: "You don't have to do that. I'll admit I'm guilty." Blum told Keene that he wanted a court record showing the indebtedness, and Keene said, "if you will only help me get my car back, you have the papers made up and I'll sign them." The delinquent payment on Keene's car was $580, and Mr. Blum agreed to loan this sum to Mr. Keene. The next morning, May 29, 1950, Mr. Blum and the defendants went to the office of Attorney J. Edward Whelan, whom Mr. Keene frequently consulted, who prepared an agreement for a confession of judgment, and also a confession of judgment. The agreement, which was signed by Mr. Blum and the defendants, recited that defendants were indebted to Mr. Blum for the sum of $4250 loaned to them in past years, plus a further sum of $580, making a total principal indebtedness of

$4830, for which amount they had on that day executed a confession of judgment to William Blum and Dorothy Blum bearing interest from the date of its filing at 6% per year. The agreement also provided: "That to liquidate said judgment, it is agreed by all parties to this agreement that said Donald J. Keene and Myrtle C. Keene shall pay the sum of $12 per week for 48 weeks commencing June 3, 1950 and each week thereafter until 48 payments have been made and thereafter balance shall be due on demand, plus interest at 6% on $4250 which was the amount of cash advanced to Donald J. Keene, and Myrtle C. Keene from Jan. 8, 1946 to May 29, 1950."

The agreement bears date of May 29, 1950, and was signed and acknowledged by William Blum and the defendants before J. E. Whelan, notary public, and the latter's signature and seal are affixed to the agreement.

At the same time the confession of judgment for $4830, with interest at 6% a year from May 29, 1950, was signed and sworn to by plaintiffs before J. E. Whelan, notary public, as noted over his signature. It was filed and entered of record in the office of the clerk of the district court of Dubuque County on May 31, 1950.

Defendants admit the circumstances attending the borrowing of the $580 on May 28, and the execution of both instruments on May 29, 1950, but deny that they were signed, sworn to, or acknowledged before J. E. Whelan. They also testified that the sums of money borrowed from plaintiffs during 1946 were to bear no interest, and that Mr. Blum told them at the time the money was borrowed there would be no interest if his coin-operated machines could be placed in defendants' oil station. Defendants also testified that they did not think the provision for interest on these borrowed sums was in the agreement for the confession of judgment when they signed. Plaintiffs testified that the blank checks signed by defendants were delivered to Mr. Keene and destroyed by him when the confession of judgment instruments were executed. Defendants denied this.

No memorandum check was signed by either defendant for the $580 loan for payment on defendants' automobile, since this loan was incorporated in the judgment confession. The only

payments of the weekly installments of $12 provided for in the agreement for the judgment confession were made by Mr. Keene on June 3, 10, 17 and 24, 1950, totalling $48. These were the only payments ever made by defendants on any of their indebtedness to the plaintiffs. Two receipts for these four payments signed by Mr. Blum were received in evidence.

Mr. Blum testified that the next indebtedness incurred by defendants to him was on June 2, 1950, at which time Mr. Keene told him that vacation expense had made him short of money which he needed to replenish his stock of merchandise; that at his home, where all loans to defendants were made, he gave Mr. Keene $500 in cash on that date and he signed his name "Donald J. Keene" on the blank check. This signed check is before us. It is a blank check of the American Trust & Savings Bank, of Dubuque, as follows:

"Dubuque, Iowa <em>June 2, 1950</em>

Pay to the order of <em>Cash</em> <em>$500.00</em>
 <em>Five Hundred</em> and <em>no 00/100</em> Dollars

Donald J. Keene"

The italicized words and figures are in the handwriting of Mr. Blum.

Mr. Blum also testified that on October 5, 1950, Mr. Keene next came to him and solicited $500 which he needed in connection with an action at law brought against him by Carpenter Oil, Inc., as assignee of L. L. Coryell & Son, Inc., the lessee in a ten-year lease of Mr. Keene, lessor, covering the premises involved herein. The plaintiff in the action prayed judgment for $3500 against Keene for keeping it out of possession of the property. The petition was filed January 21, 1950, and the action was dismissed with prejudice by the plaintiff, November 12, 1951. Mr. Keene had the same firm of attorneys representing him in that case as he has in the case before us.

Mr. Blum testified that he loaned Mr. Keene $500 in cash on October 5, 1950, and the latter left with him a memorandum check signed by Keene identical with the check of June 2, 1950, set out above, except for the date. Mr. Keene also denied this transaction. He does not deny his signatures on these blanks, and a comparison of them with his other signatures in evidence

leaves no doubt that all were made with his hand. All the writing on both checks is with green ink which plaintiffs testified they kept in their writing desk at home. It is defendants' contention that these two checks had been signed by Mr. Keene in procuring two previous cash advances comprising a part of the $4250, all of which both defendants had repeatedly testified were not dated, and, instead of their being destroyed, plaintiffs had kept them and later filled in the dates of June 2 and October 5, 1950, in order to support their fraudulent contention that new loans of $500 each had been made on these dates. They insist that the ink in the two dates is different from the other writing on the checks. Plaintiffs denied any such acts. We cannot note any dissimilarity in the ink on either exhibit.

Some further description of the property is necessary. The main building was built of concrete blocks and is a story and a half high with asphalt shingle roof. In the basement is a room, that at times was used as a tavern, the equipment of which was furnished by the tenant. The entrance to it is from the outside and at the rear of the building. In it were two toilets and a lavatory. The ground floor of the main building was a combination office and restaurant. The office occupied but a small space and in addition to a cash register and usual equipment there was a small stock of supplies such as spark plugs, tubes and tires, oil, other articles which a motorist might need. The restaurant consisted of a lunch counter with stools on one side of the room, and a number of booths on the other side with tables and seats or chairs. Mr. Keene with the aid of a carpenter had built these booths. There was the usual equipment of cooking utensils, dishes, stoves, refrigerators, soft drink, beer, and ice cream coolers. There was a washroom and toilet on this floor. The second floor which was reached only from the inside by going through the office and restaurant had seven small bedrooms, a kitchenette, toilet and shower. Defendants lived on the second floor and occupied one of the bedrooms and the kitchenette as living quarters. The other bedrooms were used by truckers who might wish to lodge overnight. The size of these rooms and the size of the basement do not appear. There were two service pumps and two tanks for gasoline and two for diesel

oil. There was no canopy. The station was used quite largely as a truck stop. It was open throughout the twenty-four hours. Mr. Keene had the night shift and Mrs. Keene was in charge during the day. The walls of the first-floor rooms were plastered and top floors of maple covered the concrete floors of the first and second stories.

In 1948 or 1949, the record is not clear which, defendants constructed a one-story cement block garage, separate from the main building, the dimensions of which were 26 by 32 feet. It had a tar roof, concrete floor and unplastered walls. It was heated but had no plumbing. In it defendants installed an air lift hoist, chain fall, air compressor, tools and incidental equip-. ment for servicing automobiles. Keene estimated the construction and equipment of the garage cost him about $4000.

In May 1950 Mr. Keene became ill and on July 4, 1950, was operated upon for a ruptured appendix, and because of further complications in that area he had another operation in October 1950. He testified that another operation was necessary, and he was in very poor health and unable to do any work at the time of the trial. Because of the additional work on Mrs. Keene the keeping of lodgers on the second floor was discontinued. Defendants failed to meet the monthly payments on the note and mortgage of the State Bank of East Dubuque that were due on the 8th of November, and December 1950, and on January 8, 1951. Defendants testified that when they tendered payment of the amount in default the bank refused to accept the loan as its board had decided to foreclose. The bank filed petition for judgment of $1869.49 with interest and costs and for decree of foreclosure. Mr. and Mrs. Blum were made defendants as junior lienholders. Carpenter Oil, Inc., and Dubuque County were also defendants. When the original notices were served on the Blums, Mr. Blum called on Mr. Keene and showed him the notices. Mr. Keene said, according to Mr. Blum, "Oh, that's nothing. I have got a year to pay that up." Mr. Blum replied that what he said might be true, but that he had too much invested in the place and he was going to see a lawyer. He went to see Herbert J. Hoffmann of the firm of Kenline, Roedell, Hoffmann & Reynolds and was advised to attend the sheriff's

sale and to see to it, either by his own bid or that of someone else, that the amount bid was high enough to cover the judgment of plaintiff and all costs and the amount due him on his judgment. Default judgment and decree was entered for the plaintiff on May 8, 1951, as prayed.

Sometime in May 1951 Mr. Keene came to Mr. Blum and told him that he had tried to borrow money from different ones to pay the judgment but had been unable to get it. Blum testified: that he told Mr. Keene several times that he would loan him no more money, and Mr. Keene then asked him what was his best offer for the place, if he bought it, and he told Mr. Keene that he did not want the place, and that a thousand dollars above the money owing him was all he would pay; that Keene discussed it with him over a period of three or four days and asked him to raise his offer some, and he told him $1000 was all he would give for the entire property, both real estate and personal, but he would give him time to get his stock down; that Keene said he would talk it over with his wife, and the next day he came back still asking for a raise in the offer, and he again told him he would not put another dime in the place, and Keene then showed him the notice of levy and sale the sheriff had served on him, and remarked that he would rather he (Blum) would have the property than the bank; he and Keene then made an inventory on a sheet of paper of the principal items of property; and in the presence of Mr. Keene, Mr. Blum then telephoned Attorney Hoffmann for an appointment for himself and Mr. Keene on the following day, to have the papers drawn and the transaction closed; that Mr. Hoffmann was not his regular attorney but he had made no charge when he had asked him for advice in the foreclosure matter, and when he suggested him, Mr. Keene said it made no difference to him.

The appointment was for June 7, 1951, and Mr. Blum reached the law office a few minutes in advance of Mr. Keene and his wife and gave Mr. Hoffmann the memoranda for drawing a warranty deed and a bill of sale. The lawyer instructed his secretary, Miss Palen, in drawing the instruments. When the Keenes came in Mr. Hoffmann was introduced to them and he asked if they were to execute the warranty deed and a bill of

sale he was having prepared, and they replied that they were. Shortly after the secretary returned with the papers and after he looked them over Mr. Hoffmann handed them to the parties and each of them read them. Mrs. Keene then said: "Here! We are not selling our furniture", and Mr. Blum said: "No, that should not be in there." At Mr. Hoffmann's direction his secretary took the bill of sale and struck out those words in the two places where they appeared, and returned with it.

With respect to what follows, Mr. Blum testified: "Q. And then was there any further conversation about the nature of these instruments? A. Donald Keene, or Myrtle Keene, in fact, it may have been both, asked that they would just like to borrow the money, and we had a small discussion. I said I would just as soon not have anything to do with it. I said: 'I am buying it as a business investment. So far as the place itself, it would just be a headache to me. I am buying it for investment, only.' Mrs. Keene argued with her husband a little bit, and then said: 'All right, that is your doings.'" Mr. Hoffmann then read both papers aloud to them and explained that it was an outright sale, with no strings attached, and asked Mr. and Mrs. Keene if they understood that and both said they did.

At this time, according to Mr. Blum's testimony, Mr. R. P. Roedell, a law partner of Mr. Hoffmann's, was passing the door, and Mr. Hoffmann called him in and told him of the preparation of the deed and bill of sale and of some discussion of the matter; that he wished him to hear and witness what was taking place and to know the nature of the transaction. Then in the presence of all the parties, and addressing his remarks to Mr. Roedell, Mr. Hoffmann stated that the warranty deed and the bill of sale to be executed by Mr. and Mrs. Keene were absolute conveyances of the property described in each to Mr. and Mrs. Blum, without any reservations or conditions, or as security for indebtedness.

Mr. Roedell, as a witness for plaintiffs, confirmed the testimony of Mr. Hoffmann and testified that he heard him explain the nature of the instruments, as above stated, and saw the Keenes read and sign both the deed and the bill of sale and acknowledge the execution of each before Mr. Hoffmann, notary public, as the voluntary act and deed of each.

Miss Palen, a secretary for twenty-five years in that law office, confirmed the testimony of Mr. Blum, Mr. Hoffmann and Mr. Roedell. She testified to the preparation of the papers and to the deletion from the bill of sale of the household property in the Keene living quarters, on objection of Mrs. Keene to its inclusion; also, to the explanation of Mr. Hoffmann to the Keenes that the deed and bill of sale were absolute sales and conveyances, "and weren't to be construed as anything else."

Mr. Blum also testified that before the deed and bill of sale were executed and while they were in Mr. Hoffmann's office the Keenes mentioned that they would like the right to buy the property back and he said: "No, I told you before we came up here what we were going to have made, and that's it."

On this matter, Mr. Hoffmann, as a witness for plaintiffs, in response to a question whether or not there was any talk between the parties in his office whether the two conveyances were for security purposes only, replied: "There was. That conversation, initiated by Mrs. Keene after she had examined both instruments, and addressing herself to the subject matter of the warranty deed, in substance, was, that what she wanted was that there be some arrangement for a resale to them. And Mr. Blum responded that there wouldn't be. That there was nothing of that kind in the matter; and then she said the property was worth considerably more than the amount of money Mr. Blum had advanced and was advancing and was paying them. Mr. Blum responded, in substance: 'Not to me. It would not be worth any more than that to me. * * * If you can get the money to finance the mortgage * * * that's all right with me. But otherwise it is to be a sale and nothing else.' * * * At this juncture I [Hoffmann] stated to both Mr. and Mrs. Keene that as a notary public, who was to take the acknowledgments to these instruments, it was very important that he be completely satisfied that the grantors in the deed, signing the deed, and acknowledging it, knew and fully understood what they were signing." Explaining his reason for calling in Mr. Roedell, this testimony was given by Mr. Hoffmann: "I explained that there were two instruments to be executed. That Mrs. Keene had expressed or had made several statements that caused me

to feel that in taking their acknowledgments to these instruments, as a lawyer I wanted to obviate any possibility of the deed or the bill of sale being construed as a bill of sale or a deed in form but a mortgage in the final analysis in fact. * * * This to Mr. Roedell: I asked him therefore to sit down in my office while I carried on further conversation with the Keenes, but particularly with Mrs. Keene; and I again propounded about the same question: 'Now do you understand this to be an absolute sale?' And again she said something about 'Yes, but —' and I said: 'Well there must not be any "buts" about it. If there are then I don't want you to sign the instrument, because that would not be a deed.' * * * It was brought up by Mrs. Keene with respect to them getting a lease, and Mr. Blum said that he might consider something of that kind later, but that would be after he would get possession. The discussion had already taken place that they wanted 30 days to wind up their affairs and give possession, and I stated it would be better if there were to be any arrangements about a lease that they be made after Mr. Blum had possession."

Asked if anything was said about their right to go elsewhere and arrange for new financing, Mr. Hoffmann answered: "Mr. Blum several times told them, asked them, 'Have you anyone else that you can go to to get the finances to redeem the property from the mortgage? If you have, I would prefer you would go to someone else.' As I recall it, they told him of several people they had gone to, and banks, but they had been turned down everywhere."

Defendants had testified that while in Hoffmann's office they had been told that plaintiffs had to have a deed to the real estate in order to satisfy the judgment of the State Bank of East Dubuque; that they asked permission to consult an attorney, and that Mr. Blum said that he could not wait around all afternoon and that they had to sign or the deal was all off, and Mr. Hoffmann said Mr. Blum trusted them for years and they should trust him for a few days; that in speaking of the foreclosure sale, Mr. Blum and Mr. Hoffmann, according to Mr. Keene, said: "Well, there was just a few days left and if I didn't raise the money that way that it was up for sale and it would be sold,

and I would have to move out right away, as soon as the place was sold, and it would be out of my hands; and then Mr. Blum says that he would come out then and foreclose on all the personal property"; that with respect to Mr. Blum's conversation about taking the property over only till the papers were straightened out, Keene testified: "Yes. He said that that was the only way it could be done legal, that he could pick up the mortgage that they were foreclosing on · at the East Dubuque bank, and get the abstract up to date so I could get money to pay it off, and after the money was raised to pay him off he would give the property back to me * * * and that it would take him eighteen days to a month to find out and get the abstract straightened out and all that"; that respecting Mr. Keene's knowing he had a year in which to redeem the property, he testified: "No, I didn't. I thought my time was up. I thought when the property was sold it was out of my hands altogether and whoever bought would take possession"; to the question, "What made you think that?", Mr. Keene answered: "Well, I didn't know, and that was the way they gave me an impression on it, that as soon as the place was sold it was out of my hands." Asked who gave him that impression, he answered, "Mr. Blum." The testimony of defendants, noted just above, was all denied by Mr. Blum and Mr. Hoffmann.

To the question asked on direct examination, by his attorney: "Did Mr. Hoffmann say anything to you or to Mrs. Keene about your having any additional time to stay on the premises?" Mr. Keene replied: "No." Concerning the defendants' right of redemption, Mr. Hoffmann testified that he had no recollection of anything being said about it in his office, and his memory of it was confirmed by Mr. Keene's answer just above. In addition Mr. Blum's testimony that Mr. Keene had told him at the time the original notices were served that he had a year in which to pay the foreclosure judgment, the testimony of the defendants clearly indicates that they had knowledge of their redemption rights. After the notice of levy and sale, Mr. Keene went to the Mettel Realty Company, with which he had had real-estate transactions, for financial aid, which was refused him. He testified: "I didn't discuss the foreclosure proceedings

with no one, only the Mettel Realty Company. I was down there to try and borrow money from them, that was after the foreclosure and they thought they could let me have the money, and then after that they called me up and told me I couldn't have it. Yes, that was right about the time and I figured the year was about up. * * * It wasn't my understanding that the year had gone by * * * when I talked to the Mettels, no; the year hadn't gone by when I first went to them, no; but they had left it pending so long, I'd say a few months." And when Mrs. Keene offered the State Bank of East Dubuque the three payments in default, she testified: "They wouldn't accept the payments. They told me the place was up for sale for those back payments, and we were given a year to pay the $1800 plus the costs that they would have to go through the court to sue us for the money."

Mr. Blum testified that after defendants had executed the deed and the bill of sale and delivered them to him the matter of revenue stamps was discussed, and Mr. Hoffmann asked what the actual consideration for the purchase amounted to and he told him that the indebtedness of the Keenes to be canceled was the confessed judgment of $4830 with interest thereon at 6% a year from May 29, 1950, and, in addition, interest at the same rate on $4250 of the $4830 from January 1946 to May 29, 1950. But $48 had been paid on this debt. In addition, the $500 paid to Keenes on June 2, 1950, and the $500 paid to them on October 5, 1950, with interest from the respective dates. Further consideration was a payment of $1000 in cash at that time and the payment to be made in settlement of the foreclosure judgment approximating $2000. Mr. Hoffmann then said the consideration approximated $10,000 and revenue stamps accordingly would have to be procured. This discussion was in the presence of the Keenes. Mr. Keene testified that he heard no talk about revenue stamps, but his wife's testimony was otherwise. She testified: "I know that Mr. Blum bought the stamps and put them on the deed because he said he was going to. No, I didn't see him buy them, but he said he would. I can't recall if there was any conversation in my presence as to what the value of the stamps would be that would go on the deed."

The instruments show that they were filed for record at 3:55 p.m. on June 7, 1951, and that the revenue stamps in the amount of $10.45 were placed on the deed and canceled by Mr. Blum on that date. The amount owing on the foreclosure judgment was promptly paid in the sum of $1965.11 and receipt therefor given by judgment creditor's attorney, dated June 11, 1951, was received in evidence. Plaintiffs testified that the $1000 portion of the consideration was paid to defendants at the Blum home in cash just as all other payments had been made to them, on the evening of June 7, 1951. At this time the memorandum checks of June 2, 1950, and of October 5, 1950, were marked paid. Plaintiffs and Mr. Hoffmann testified that at the execution of the papers it was agreed that the Keenes were to have thirty days or until July 7, 1951, to vacate the property, and that the confessed judgment was to be satisfied of record when possession of the property was obtained by the Blums.

Defendants denied that plaintiffs had made the payments to them of $500 each on June 2 and October 5, 1950; denied the payment of $1000 on June 7, 1951; denied that either of them had read the two instruments which they had executed on that day; denied that Mr. Hoffmann had read or explained the instruments to them; denied that they asked in Mr. Hoffmann's office for either a lease of the premises or a right to repurchase them. Although they had received and executed deeds to ten or more properties, they testified they never read any of the deeds. They testified they did not know they executed a deed in Mr. Hoffmann's office, but thought it was a mortgage, and did not know any different until their attorney, Mr. Wright, told them it was a deed. They testified that they did not know the difference between a deed and a mortgage notwithstanding they had bought and sold several pieces of real estate and had given two or more mortgages, and leases with options.

Mrs. Keene explained the lack of knowledge thus: "Deeds are my husband's business. He owns the lots; that's my husband's business. No, I never take care of it. He takes care of it and I only sign for him. Borrowing money and signing a mortgage; that is my husband's business, but I sign when he gets them." Mr. Keene's explanation was this: "I didn't handle

all these real-estate matters for myself and my wife. I always had the real-estate company handle them. My wife always takes care of that. She takes care of the deeds and that kind of thing. * * * I don't understand them papers. I say, I always have a real-estate company take care of them or some attorney check them."

A Mr. Busson had been operating the basement tavern with his own equipment, under a lease with the Keenes at $50 a month. John Henkel bought the lease and equipment from Busson and operated the tavern from May 1, 1950, for about two years. The Keenes insisted that he pay $60 a month rent. Mr. Henkel was a witness for plaintiffs. He testified that when he paid the rent due in June 1951, Mr. Keene told him he was going to have a new landlord, and while Henkel was waiting on the trade Mr. Keene went out. Some days later he heard some of his customers say that Keene had sold out. Later in June, Mr. Blum came in to service a coin machine and told Henkel that he had bought the place, but he should pay Keene the rent due July 1, 1951. When Henkel made that payment Keene told him that Bill Blum was his new landlord. Thereafter he paid Mr. Blum the rent until about three months later when Mr. Keene asked him to see his attorney, Mr. Wright, about the rent. Henkel testified: "I didn't know what he meant. He had told me Mr. Blum had bought the place and Mr. Blum had told me he had bought it, so I didn't know where I was at and there was nothing I could do." Thereafter Mr. Henkel paid no rent to the Keenes and on February 25, 1952, they sued him for unpaid rent and attached his equipment.

Mr. Keene denied that he ever told Mr. Henkel that he had sold the property to plaintiffs.

On October 2, 1950, the Keenes insured the main building alone against fire, lightning and windstorm for $6000 for a period of one year, with no insurance on its contents, through the agency of M. P. Hogan. A loss payable clause in favor of the State Bank of East Dubuque was attached when the policy was issued. Mr. Hogan had originally insured the building on October 21, 1946, and for the years following. Mr. Hogan was a witness for the plaintiffs and testified that Mr. Blum had told

him he had bought the Keene property and desired to have more insurance protection. On July 31, 1951, Mr. and Mrs. Blum insured the main building described as restaurant, filling station, tavern and dwelling, against fire, lightning and windstorm for one year for $3000, under a new policy. The premium was $44.40. At the same time plaintiffs took like insurance for one year for $2000 on the furniture, fixtures and other contents of this building. The premium was $32.60.

At this time Mr. Hogan asked Mr. and Mrs. Keene if they had sold this property, and their answer was "that it was all over, and they 'would have to give up the whole caboodle', I think were the very words they used." They told him that it was agreeable to the State Bank of East Dubuque to delete its loss payable clause and that the title was in William Blum. Mr. Hogan said that though Mr. Blum said he was the sole owner of the property, he used a standard mortgage loss payable clause in favor of Mr. Blum, rather than a form showing an assignment of interest by the insured, because the old policy had but a short time to run, and also if Mr. Blum was shown as the new owner the company would insist on a complete re-examination of the risk, taking some time and considerable expense.

Mr. Keene denied the testimony of Mr. Hogan. He testified: "I didn't have any conversation with Mr. Hogan about the insurance on the property, at no time. No, I had the insurance with the East Dubuque bank there, I am sure on that piece of property, all the time. No, Mr. Hogan didn't ever come out to ask me whether or not I had sold the property, and if it was all right to transfer the insurance, no, not that I can recall. As to whether I would recall it if he was out there, I worked nights all of the time and I sleep during the day; and a lot of times someone comes out and they wake me up and I say, 'Yes', 'No', this or that; and later on I don't remember anything about it. That happens lots of times. Yes, I know Mike Hogan and I frequently talked to him about business affairs. If Mr. Hogan came out to ask me about insurance I would remember it, but I don't think I had insurance with him at that time. I don't recall if he came out. I couldn't say yes or no on that. I never told Mr. Hogan that Mr. Blum had bought the place; and I

never told anybody that because I never figured Mr. Blum ever bought the place." The three insurance policies, with riders, were in evidence and corroborate Mr. Blum's testimony. Mrs. Keene said that she never talked to Mr. Hogan and he never came out on any insurance business. Mr. Keene testified that he did not insure the property with any other company after June 7, 1951.

Mr. Blum testified that during the thirty days the Keenes were to have possession of the property after the 7th of June, 1951, he was at the service station two or three times a week to get gasoline, and Keenes having showed no signs of moving on July 7, he said to Mr. Keene that it did not look like he was even getting ready to go, and Keene said he surely hated to leave; that he told him to stay another week or two, and at the end of that time he said to him he thought he should have possession, and Mr. Keene said he would like to stay, and he said to Mr. Keene: "Well, if you'd like to stay, I intend to rent the place. Would you care to rent it?" Mr. Keene answered: "That would be swell." Mr. Blum asked him what attorney he would like to draw the lease and Keene said Mr. Wright and at once called him for an appointment. This was in the latter part of July 1951. Mr. Blum reached the office first and when Mr. Keene arrived Mr. Wright asked what he could do for them and Mr. Keene said: "Well, Mr. Blum can tell you. We came up for a lease." Mr. Blum's testimony as to what then took place is as follows: "Mr. Wright said: 'Now what kind of a lease would you give him, Mr. Blum?' And I said: 'Well, we discussed that. A cent on a gallon of gas for the restaurant, oil station and garage. If he wanted the upstairs and the basement and he wanted to collect the rent, it would be a cent and a half a gallon and he could collect it or sublease it or do whatever he wanted.' And Mr. Wright said: 'How long a lease will you give him?' And I said: 'A year or two if he likes it. I will give him what he wants.' And Mr. Wright said: 'What kind of an option will you give him? Will you give him an option to buy it?' And I said: 'Yes, I will give him an option to buy it if I sell it.' And he said: 'How much?' And I said: 'Donald and I have not discussed any figures'; and he started to tell

me what I had in it, and I said: 'Mr. Wright, you seem to know more about this than I do or Mr. Keene even. We came up here to talk about a lease, but evidently I don't know what you are driving at.' So he said: 'Will you step out a minute while I talk with my client?' And he sent me into the waiting room. I came back in about five minutes, and he said: 'Now Bill, we would take a year's lease with the upstairs, only I would like to have you put a price on it.' I said: 'Well, all of a sudden you are talking price.' And he started to high pressure me to let him make up the papers the way he wanted them, not the way Mr. Keene and I wanted them and so I said: 'It don't look as if we are going to get a lease here, and if you don't I'll go.' And he said: 'It don't make any difference to me; but I'll tell you one thing, Mr. Gilloon is hotter than hell about this thing.' After that I walked out of Mr. Wright's office."

Mr. Keene gave an equivocating, evasive account of the conference with Mr. Wright. He admits that he and Mr. Blum made the appointment and met with Mr. Wright. He testified:

"I don't know if I ever had any conversation, after this matter was taken care of [on June 7, 1951], with Mr. Blum about leasing it from him. He was talking about leasing it * * *. I didn't know what Mr. Blum meant by 'the lease' and that. * * *.

"Q. Did you, or didn't you, go to Mr. Wright's office to have a lease prepared for you and Mr. Blum to sign? A. I went to his office to have him check the papers and see what they was. I didn't understand them and I wouldn't sign until an attorney would check them.

"Q. Well, you had already signed them long since? What papers were you going to have Mr. Wright check? A. I don't know, there was so much back and forth, there. I didn't understand what it was. * * *.

"Q. Well, what was your idea of going down to see Mr. Wright and to have Mr. Blum there? Had you talked to Mr. Blum about it? A. Well, I didn't know just what he was trying

to do, or what he was trying to crowd me in, and so I thought it was time to see an attorney. Mr. Blum was coming out there and talking about this and that, and I didn't understand what he was trying to do. * * *.

"Q. Isn't it true that you and he had agreed to go down and draw up a lease of the property from him? A. Well, I don't know. He was talking about a lease. I didn't know what it was. If I had, I probably would have signed it right at the time. * * *.

"Q. Didn't you tell Mr. Blum that you wanted Mr. Wright to make out the lease? A. I can't remember telling him that."

After this meeting in Mr. Wright's office notice to quit the premises was promptly served on the Keenes by plaintiffs, and soon after plaintiffs' petition was filed.

Defendants have stressed their contention that Mr. Keene had no educational schooling beyond the eighth grade; that he had little business experience, particularly in matters of real estate, and that Mr. Blum was a crafty businessman who took advantage of these deficiencies, and his financial difficulties, dominated him, and took him to his own lawyer, and persuaded him not to get independent legal advice. It may be conceded that Mr. Keene's schooling was limited, but there is no support, of any substance, for the other contentions. Every transaction between them was initiated by the defendants. The Blums were in fact most lenient creditors. Though defendants were very indifferent to their obligations as debtors of plaintiffs, there is no evidence that plaintiffs ever pressed defendants or took any harsh or improper measures against them. Defendants were not novices in real-estate transactions. They were familiar with deeds, mortgages, leases and options to buy. They bought a home prior to World War II and mortgaged it and later sold it to Mel Schroeder. Before the purchase of these lots involved in this litigation, in 1946 from John E. Miller, they owned six other lots. On January 10, 1946, they conveyed by warranty deed Lots 64 and 65, in the Linehan Park Addition to Mettel Realty Company. On February 20, 1950, they quitclaimed a lot abutting on Lot 78 in said Addition to the same grantee. On

April 18, 1950, they conveyed property by warranty deed to Concrete Blocks, Inc. In April of 1949 they conveyed by warranty deed a lot to Byron Bolsinger. They executed the mortgage to the East Dubuque bank in January 1947. On June 8, 1944, they mortgaged two lots to Wm. C. and Elizabeth Moss. On June 19, 1947, they leased property to Roy and Ruth Welch, which lease included an option to buy. On March 14, 1950, they leased property to Concrete Blocks, Inc., with an option to buy, and on December 28, 1950, they leased property to the same lessee without an option to buy. They were familiar with abstracts of title and their purposes. In these transactions they often consulted with Attorney J. Edward Whelan and other attorneys. In Mr. Keene's petition for divorce against his codefendant herein, Myrtle C. Keene, filed October 2, 1950, in which Mr. Whelan was his attorney, he asked that any equity which his wife had in Lots 77, 79, 118, 119, 120, 121 in Linehan Park Addition be decreed to him.

His retaining of and his relations with lawyers indicate that he appreciated their aid and importance. The attorneys for him in this action filed various pleadings for him in 1950 in Carpenter Oil, Inc. vs. Donald J. Keene. They also appeared for him in Donald J. Keene and Myrtle C. Keene vs. John Henkel in 1950. Lacy & Lacy were his attorneys in Donald J. Keene vs. Elmer Harwick, in which petition was filed July 29, 1949. We have already noted that Mr. Whelan filed petition for Mr. Keene in his divorce action. Various federal and state tax proceedings were brought against defendants. The record shows that he had operated two taverns and two service stations. Whatever financial difficulties defendant had were in no manner caused or contributed to by plaintiffs.

That defendants were resourceful in seeking to defeat plaintiffs in this suit appears in their pleadings. In paragraph 9 of their amended and substituted counterclaim, they alleged: "That since the inception of plaintiffs' suit for possession of said real estate, William Blum has been frequenting and loitering about defendants' premises, parking his automobile in defendants' driveway, inducing others to harass and annoy defendants and interfering with defendants' oil station, garage and restaurant

business; that said William Blum has been doing said acts maliciously and consistently on a daily basis during both the daytime and the nighttime; that said acts of William Blum constitute a nuisance and have caused defendants inconvenience, loss of business and loss of profit and should be enjoined and restrained by injunction.

"Par. 10. That as a result of said malicious, willful and wrongful acts of plaintiff William Blum, defendants have been damaged in the sum of $5000 to date and will sustain further and additional damage if said conduct is not immediately and permanently enjoined."

This pleading was verified by Mr. Keene. By amendment filed November 5, 1952, to defendants' amended and substituted counterclaim, paragraphs 9 and 10, just above, and paragraphs 12 and 13, related thereto, together with applicable parts of the prayer, were deleted.

Defendants filed their second amendment to answer January 22, 1952, in Division VI, of which they alleged:

"Par. 7. That in addition to said mortgage to State Bank of East Dubuque defendants borrowed from plaintiff William Blum approximately the sum of $4450 to complete the construction of said building with the understanding that William Blum be given the privilege of placing slot machines, which he owned, in the tavern portion of said building, and with the further proviso that the profits from the operation of said slot machines were to be distributed as follows: 50% to William Blum, 25% to the tavern lessee and 25% to defendant Donald J. Keene.

"Par. 8. That, in conformity with that agreement, William Blum did place certain slot machines in the tavern portion of said premises which slot machines operated for a period of 8 or 9 months.

"Par. 9. That the operation of said slot machines involved an element of chance and the ownership, possession and operation thereof was illegal under the laws of Iowa.

"Par. 10. That said advance made by William Blum in the sum of $4450 was tinged with illegality and therefore constituted a nonenforceable legal obligation.

"Par. 11. That, however, defendants executed a confession of judgment on May 29, 1950, in the sum of $4830 * * *; that said confession of judgment constituted an acknowledgment of said illegal indebtedness * * * of approximately $4450.

"* * *.

"Par. 16. That since a portion of the consideration supporting the execution of said instrument labeled Warranty Deed is in fact an illegal consideration said instrument therefore is void and unenforceable as a deed of conveyance * * *."

On motion of plaintiffs the allegations in the quoted paragraphs were stricken. These allegations, which were withdrawn or stricken from the record, are mentioned only because they bear upon the probative value of defendants' testimony and the soundness of the contentions made in their behalf.

Something is urged in behalf of defendants that their homestead is in this property. After the second story of the main building was completed about January 1947, Mr. and Mrs. Keene made their home in a small space in the property. Mr. Keene testified: "That is a business out there. I don't consider that a piece of property. I built a place of business. I didn't build it for a home to live in." But the fact that the property, in small part, is occupied by defendants as a homestead is of little, if any, importance. A large part of their indebtedness to plaintiffs was incurred before any homestead rights accrued. Both defendants joined in the deed.

Defendants vigorously insist that the consideration which plaintiffs testified they paid for the property conveyed by the deed and the bill of sale, if accepted as true, is so grossly inadequate as to give strong support to defendants' position that the instruments were executed only as security for indebtedness. According to the computation of plaintiffs' attorneys as set out in their brief and argument, including items of principal with interest computed to the date of the execution of the instruments, the total consideration was $10,217.92. We have not recomputed it, but defendants have not challenged the mathematical computation.

The witnesses for plaintiffs as to the value of the real

estate were Mr. Voelker, Mr. Kuehnle and Mr. Bush. All of them were members of the Dubuque Real Estate Board and sole members of the Appraisal Committee of the Appraisal Division of that Board. As a realtor Mr. Voelker had been in that business in Dubuque for forty-five years. He had been president of the Board. He did appraisal work for various governmental bodies. Within the month preceding the trial this Appraisal Committee had made an extensive appraisal for the Molo Oil Company, the Perfection Oil Company and the Shell Petroleum Company, of properties of the same type as the property here involved. Mr. Voelker described the modus operandi of the Board thus: "As far as receiving this commission is concerned the Real Estate Board receives requests from various people. They then turn them over to the Appraisal Committee to make the appraisals. It comes from the secretary of the Real Estate Board. * * * From the standpoint of this appraisal I didn't have any discussion with any of the attorneys or the litigants, none at all. Mr. Kuehnle and Mr. Bush and myself were commissioned to make this appraisal which was made under date of December 14, 1951."

Mr. Keene had testified that he had tried to interest the Voelker Company in refinancing the property, but was unsuccessful. Mr. Voelker confirmed this testimony. He said: "Mr. Keene tried to refinance the property with our firm. I couldn't give you the date. They were in and out of my office right along." Mr. Voelker also testified: "At the present time I do all the Veterans' appraisals. I do a lot of private appraisals for industry and for banks and for some insurance companies, and so on. Our Appraisal Committee also does appraisal work for the City of Dubuque; we have just compiled an appraisal for the City, and the Committee has done three or four other large appraisals for the City." His experience included the construction of many buildings, and he had gone through all phases of construction, finance, and the sale of real estate. Describing the Committee's method of evaluating buildings, he said: "We arrive at a cubical content of the building; we then apply a certain base per cubic foot for that type of building. The building is then depreciated for its physical condition; for its

functionability and for economic standpoint. * * * The physical, you all know what I mean on that. But the functional would mean easy access to different parts of the building, its modernity and so on; and the economic is its location in reference to neighborhood. As to the neighborhood in which this property is located, I would consider that end out there a 'down-trend neighborhood'. There was some physical depreciation and there was some settlement. Crackage due to settlement."

The witness was familiar with the locality. The neighborhood immediately east "is a residential type area consisting of a lot of small poorly built homes." The witness and his associates considered replacement costs and potential rental value, which was placed at $150 a month. The depreciation taken on the main building was 25% for physical condition, 15% for economic and 10% for functional. This witness valued the land at $25 a front foot, or $2500, the depreciated value of the main building at $11,033, and the depreciated value of the garage at $2282, making a total valuation of $15,815. Two other properties, somewhat comparable, were valued at $14,000 and $15,500.

Mr. Kuehnle had been a realtor since 1921. He was the president of the Dubuque Real Estate Association and a member of the American Institute of Real Estate Appraisers. Omitting the matters covered by Mr. Voelker, he testified that there was some physical settlement particularly noticeable in the basement of the main building and it needed decoration and painting and necessary preparatory work. The functional condition of the building respecting arrangement was not good as the only entrance to the basement was an open, outside staircase and to get upstairs you had to come inside the café and around the counter and upstairs; there was no private entrance either front or back, and the rooms upstairs were under the pitch of the roof. He said the summation value, which they used—the reproduction cost less reasonable depreciation, plus the ground value —was reasonably close to the market value, and the fair value. He placed the fair market value as around $15,000, and the rental value of the entire property at $150 a month. At one time the witness had charge of all appraisals in Iowa for the Home Owners Loan Corporation, with forty-nine appraisers under him.

Mr. Bush had been in the real-estate business for twenty-seven years. He was a member of the Dubuque Real Estate Board, the State Board, the National Board, and the Brokers Institute. He made appraisals for R.F.C., Equitable Life Insurance Company, Swift & Company and many others. Respecting values in that locality he said in his opinion there would be more chance of depreciation than appreciation; the neighborhood is pretty low and swampy. Of this property he testified: "It is built on filled ground. We didn't think those buildings out there were a first-class construction job from the standpoint of depreciation and the type of construction and workmanship and so forth, and we didn't think it had been very well maintained * * *. We noticed there was quite a little settlement in the rear. * * * Well, we figured the fair market value of the entire property would be around $15,000. * * *. This particular appraisal reached us through the Real Estate Board, and this matter wasn't discussed with the plaintiff in this case, Mr. Blum, or any of the attorneys before we made our appraisal. I personally don't know either of the parties."

The value of $15,000, as testified by Mr. Kuehnle, "would be the value that it should bring after a reasonable effort had been made—sales effort and advertisement for a period of say from three to six months." In valuing the garage the witness included the hoist.

The only witness for plaintiff who put a value on the personal property in the bill of sale was Mr. Blum, who placed it at $1000 "to $1500, top." During the thirty days before surrendering possession, according to the testimony for plaintiffs, the defendants were accorded the right to dispose of merchandise.

Two real-estate brokers, of far less experience than plaintiffs' value witnesses, testified to the value of the real estate. Mr. Graff had previously been employed by the Shell and Phillips Petroleum Companies. His valuation of the property, based on replacement cost of the buildings, was a total of $38,000 —replacement cost of the main building at $23,000, the garage, including hoist, at $7000, and the value of the land at $8000. Basing his opinion on Mr. Keene's statement of an average

monthly sale of 10,000 gallons of gasoline, and his own estimate of one gallon of oil to forty gallons of gasoline sold, he placed the reasonable market value of the property on June 7, 1951, "based on potential income", at about $43,000. Asked what he understood as the fair market value of a business property, he answered, "income, potential income." Asked what the sale price of the property would be, he answered: "Well, I would base that, forty-three thousand; ten per cent of the selling price that would net him $360 a month. That would gross ten per cent. Q. And there is no room in there for depreciation, taxes, and risked loss; is that right? A. No, there wouldn't be on that, but we figure if we can gross ten per cent that should net you between five and seven per cent depending on the depreciation, the taxes and everything."

Based in part on information received from defendants, he placed the monthly rental value of the tavern at $60, the restaurant at $70, the upstairs at $50, the oil station at $100 and the garage at $80, or a total of $360 a month. Summing up, he stated that his "opinion of the value of this property was based purely on the replacement value and a consideration of the capitalization of the potential income of the property as a going business."

There is a discrepancy between plaintiffs' value witnesses and those of defendants. Mr. Voelker testified "the lots are platted as being 46 by 100 lying lengthwise along the highway", less some land condemned for highway purposes. Mr. Graff and Mr. Butt said they understood the depth was 138 feet. Mr. Butt had been in the real-estate business in Dubuque for seven and one-half years. He stated that it was a hard question to state the fair and reasonable market value of the property, "it is worth what it will bring. I would say the owner would be losing money if he didn't receive between $35,000 and $40,000 for it. * * * In estimating the fair and reasonable replacement cost of the main building on June 7, 1951, I don't believe you could build it for less than $16,000 or $17,000. The garage would probably run about $5600, and the steam plant, in addition, probably $1000. I am including the cost of the hoist in that total figure which I understand was about a $2000 installation.

[Mr. Keene so testified.] The garage building without the hoist would cost about $4000. * * * I would say the land is worth at least $6000 or $7000." He estimated rental values aboùt as Mr. Graff did.

Mr. Keene testified that the bare land was worth about $15,000 or $18,000, and that he put $35,000 into the main building and $4000 into the garage and its equipment for a total valuation of $57,000. He placed the total rental value of the property at about $400 a month. He estimated that the gallonage sold at the station was from 12,000 to 15,000 a month.

Mrs. Keene testified that they had invested $50,000 in the property, "counting fixtures, building and labor, mostly. I mean building it", and that "we were offered $45,000 for it. I don't know when. My husband told me. I don't know who, some oil company. I have no idea." Her husband did not enlighten the court about the offer. She testified: "Our gross business out there per month has been going $65,000." That would be $880,000 a year. That appears to be a greatly exaggerated total though it be conceded that 15,000 gallons of gasoline was bought monthly at twenty-three cents a gallon and was sold at twenty-six cents, with a much less quantity of oil handled for less money. The values which defendants put on the real estate and buildings greatly exceed those of their value witnesses, for instance, Mr. Keene's testimony that their land alone was worth $15,000 or $18,000 and that they put $35,000 into the larger building.

They alone testified to the value of their personal property, and it appears to us with the same overestimation of values. We cannot go into the details. Almost all of it had been in use for over four years, yet Mrs. Keene valued twenty or more kinds of articles at their estimated purchase price—we say estimated because not a book, record or paper was offered of what any price was. She testified that there was no depreciation, but that their values had appreciated. Chairs and tables bought when the restaurant was opened in 1947 for $7.50 and $8 each, respectively, were valued each at $10 and $12, respectively. Kitchenware and tableware which they said cost them $450 were still said to be worth that much. Mr. Keene conceded that two

or three articles had depreciated some. They valued the personal property somewhat in excess of $10,000 as of June 7, 1951. On this personal property they carried no insurance. No insurance was carried on the garage. On the main building, which Mr. Keene said was worth $35,000, insurance for but $6000 was carried. Though they testified the land and buildings were worth in excess of $50,000, yet every moneylender and bank, whom they solicited, refused to lend them $2000 to pay the foreclosure judgment and accept the property, or their equity in it, as security.

The able and experienced trial judge saw the witnesses and heard the testimony and found against defendants on every disputed issue of fact. He found that on June 7, 1951, they knew what their redemption rights were in the foreclosure suit, and that on the day before they had made a contract to sell the property to the plaintiffs. He found that when the conveyances were executed on June 7, 1951, they were fully informed and knew that the instruments were absolute conveyances. He found: "That it was agreed before said instruments were executed that defendants' indebtedness to plaintiffs would be canceled by said instruments; that defendants would have possession until July 7, 1951, in which time to reduce their stock on hand and find a place to live; that the formal release of their confession of judgment would be made at the time possession was given; that plaintiff William Blum was to pay the * * * foreclosure judgment and costs (which was done immediately after the execution of said instruments); that plaintiff William Blum was to pay defendants $1000 (which was done the same day after the execution of said instruments)."

The court further found that Donald J. Keene told John Henkel that William Blum was his new landlord, and "That during the month of July 1951 Donald Keene orally agreed to rent the premises in question from William Blum * * * and Donald Keene called his attorney on the phone and made an appointment to have the lease drawn up, which lease was never consummated by reason of the fact that Donald Keene and his attorney wanted an option to purchase and price stated inserted in said lease."

 While this court reviews the facts and the law anew in an appeal of this kind and is not bound by the findings of the trial court, yet we give weight to its findings of both law and fact, and particularly to findings of fact where the credibility of the testimony of witnesses has an important bearing. It is unnecessary to cite authorities, but see England v. England, 243 Iowa 274, 278, 51 N.W.2d 437, 440, and cases cited; Thompson v. Thompson, 240 Iowa 1162, 1171, 39 N.W.2d 132, 137, and cases cited; Bell v. Pierschbacher, 245 Iowa 436, 62 N.W.2d 784. But we are abidingly satisfied from a reading of the record before us of the rightness of the judgment and decree of the district court.

There is no substantial dispute between the litigants as to the pertinent principles of law. Plaintiffs concede that a warranty deed under some circumstances may be shown by parol testimony to have been intended in fact to be a mortgage given only for security, but they insist that the burden is upon the one so asserting to establish such fact by clear, satisfactory and convincing evidence. They insist that the rule of such cases as Reusch v. Shafer, 241 Iowa 536, 41 N.W.2d 651, and numerous other decisions, is here applicable.

 On the other hand, defendants rely on the principle that where a mortgagor, or one in like position, sells or releases his interest to the mortgagee or to one similarly placed, so as to deprive himself of his equity of redemption, such transaction is viewed with suspicion and will be carefully scrutinized by a court of equity, and will be sustained only when it clearly appears that it was fairly and unequivocally entered into and that both parties so intended. The burden of so establishing is on the party so asserting. This rule is followed by courts generally, and has been repeatedly announced by this court. See, among other cases and authorities cited therein, Fort v. Colby, 165 Iowa 95, 121 et seq., 144 N.W. 393; Holman v. Mason City Auto Co., 186 Iowa 704, 707, 171 N.W. 12; Guttenfelder v. Iebsen, 230 Iowa 1080, 1082 et seq., 300 N.W. 299, 302; Koob v. Zoller, 231 Iowa 1106, 1110, 1111, 3 N.W.2d 130, 132, 133; Brown v. Hermance, 233 Iowa 510, 515, 10 N.W.2d 66, 68; Davis v. Wilson, 237 Iowa 494, 503–505, 21 N.W.2d 553; Swartz v. Stone, 243 Iowa 128, 132, 133, 49 N.W.2d 475.

The principle is well stated in Guttenfelder v. Iebsen, supra, 230 Iowa 1080, 1084, 300 N.W. 299, 301, thus: "To summarize the law applicable to this case, such a transaction as appellants seek to enforce will be closely scrutinized and upheld only where it is perfectly fair, based upon adequate consideration and it clearly and unmistakably appears that an absolute sale and not a transfer for security only was within the contemplation of the parties. In arriving at the intention of the contracting parties courts look behind the form of the instruments to the real relationship between the parties. Fort v. Colby, 165 Iowa 95, 121, 144 N.W. 393. The instruments must be read in the light of the surrounding circumstances and the practical construction which the parties themselves placed thereon [citing cases]."

While this is not a mortgagor-mortgagee situation it is akin to it. Plaintiffs were not mortgagees, but they had a judgment lien, which, if enforced by execution, would entitle defendants to the statutory right of redemption. The consideration for the transfers was not wholly the past judgment indebtedness. It was about half the consideration. One thousand dollars of the consideration was past unsecured indebtedness; approximately $2000 of it was a new debt just contracted, and $1000 was cash paid on the purchase price. It is conceded that of this latter sum almost $2000 paid to the East Dubuque bank is a valid debt. Defendants deny receipt of the two $500 payments, on June 2 and October 5, 1950, and the payment of $1000, but it is our conclusion that defendants received these payments. The entire consideration was not a nominal one. It was a substantial one, even though it was less than the value of the property received. We accept the testimony of the plaintiffs' witnesses of the value of the real estate as of much greater probative worth than the values placed on it by defendants and their witnesses. Under the rule that defendants had the burden of showing by clear, convincing and satisfactory evidence that the deed and bill of sale were intended as instruments of security, they have failed. And under the rule contended for by defendants it is our conclusion that plaintiffs have met the burden and have clearly established in the manner and by the

weight of evidence announced by our decisions that the instruments were intended by the parties to be absolute conveyances, and not instruments of security.

In matters of fact the evidence in each particular case must control and determine the decision. We have set out the record at great length so that the facts may speak for themselves, and we think they speak convincingly for plaintiffs. The testimony of plaintiffs with respect to the transactions, and to matters behind, is wholly uncorroborated by the testimony of other witnesses. With respect to the operation of their business no paper evidence was offered in support of their words. Apparently they had no employees. None was a witness. And no one whom they served or who served them was called. Other than the statement of Mrs. Keene that their gross business was $65,000 a month, each denied knowledge of either income or profit for any period of time. No data was furnished of any building expense. They contradicted the testimony, almost in its entirety, of every witness for plaintiffs about every transaction or event. Plaintiffs and Mr. Hoffmann were, in effect, charged with wrongfully conspiring to defraud them, with Mr. Roedell and Miss Palen as abettors. Mr. Henkel, a tenant who operated the tavern for two years, and, so far as shown, on friendly terms with defendants, is charged with falsifying his testimony. Mr. M. C. Hogan, with whom Mr. Keene often consulted about business matters, and who had defendants' insurance business for several years, is contradicted. He denied that he told Hogan he had sold the place to plaintiffs. He denied that Hogan had consulted him about satisfying the loss payable clause of the East Dubuque bank on defendants' insurance policy and attaching a loss payable rider in favor of plaintiffs. He testified that the East Dubuque bank carried his insurance and that he had none with Hogan, and had not seen him in four years. In evidence is the policy on this property with defendants as insured, dated October 2, 1950, for October 21, 1950 to October 21, 1951, naming M. C. Hogan as agent, attached is a clause payable rider in favor of William Blum, and stating the satisfaction of the East Dubuque rider, with M. C. Hogan's signature as agent, dated July 31, 1951. The Keenes had possession of this policy. It fully corroborates

all of Mr. Hogan's testimony and refutes Mr. Keene's testimony as false, and probably intentionally and maliciously so.

The allegations in defendants' pleadings, set out herein, both verified by Mr. Keene, indicate how far he was willing to go to defeat plaintiffs' action.

The appointment he made for himself and Mr. Blum, with Mr. Wright, to have a lease drawn covering this property with the plaintiffs as lessors and the defendants as lessees, is most cogent proof that Mr. Keene intended the deed and bill of sale to be absolute conveyances, and that he knew they were such, and were not mortgages or security instruments. His vacillating and inconsistent testimony of this conference, which concluded with "I don't remember", is more indicative of its falsity than an outright denial. The testimony of this witness clearly established as false in one or more instances is most weighty proof that other testimony given by him relative to the execution of the deed and bill of sale and of other matters was also false. The veracity of defendants and the credibility of their testimony are open to fair challenge.

There is no doubt that the property covered by the bill of sale was of value, but we are convinced that its value was very greatly below that placed on it by the defendants.

■ While the fact that the property conveyed may have substantially exceeded in value the consideration given for it by the plaintiffs is a proper element in the determination of whether the instruments involved were absolute sales, or were devices for security, this fact is not conclusive that they were given for security.

The judgment and decree are—Affirmed.

All JUSTICES concur except SMITH, J., who takes no part.